[Nos. D057677, D058611. Fourth Dist., Div. One. Jan. 5, 2012.]

In re the Marriage of JOSEPH A. and MARYANNE K. SORGE.
JOSEPH A. SORGE, Appellant, v.
MARYANNE K. SORGE, Respondent.

COUNSEL

Garrett Clark Dailey for Appellant.

Procopio, Cory, Hargreaves & Savitch, Lionel P. Hernholm, Jr., David M. Zachry; and Stephen Temko for Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

Joseph A. Sorge appeals after the trial court modified the child support awarded to his ex-wife, Maryanne K. Sorge, and awarded Maryanne[1] sanctions and attorney fees, both related to the costs of the underlying litigation, as well as pendente lite attorney fees for defending against Joseph's appeal.

On appeal, Joseph first contends that the trial court erred in calculating the child support amount. According to Joseph, the trial court ignored his bona fide business expenses in calculating his monthly income, in contravention of Family Code[2] section 4058, subdivision (a)(2).

Joseph also contends that the trial court erred in concluding that for purposes of section 2102, subdivision (c), the parties' duty to disclose to each other, sua sponte, all material changes in their financial status continues from the date of separation until the trial court no longer has jurisdiction to order child support. Joseph argues that the court erred in determining that the cessation of a child support obligation is the event that constitutes a "valid, enforceable, and binding resolution of all issues relating to child . . . support" under section 2102, subdivision (c). According to Joseph, because the trial court's award of sanctions to Maryanne was based in part on the court's erroneous interpretation of section 2102, subdivision (c), the sanction order must be reversed.

Finally, Joseph contends that the trial court abused its discretion in awarding Maryanne attorney fees in the amount of $200,000 for proceedings in the trial court and $60,000 in pendente lite attorney fees for proceedings on

---

[1] We will refer to the parties by their first names for the sake of clarity.

[2] Further statutory references are to the Family Code unless otherwise indicated.

appeal[3] because Maryanne has no need for these fees, since she has a net worth of over $14 million, more than half of which is in liquid assets.

We conclude that the trial court erred in sanctioning Joseph on the ground that he breached his fiduciary duty under section 2102, subdivision (c) to disclose to Maryanne all material changes in his income. Specifically, we conclude that any fiduciary duty that Joseph had to disclose material changes in his income to Maryanne ended upon entry of their 2002 divorce decree. We reject all of Joseph's other contentions.

The trial court's sanction order must be reversed and the matter remanded for the trial court to reconsider that issue. In all other respects, we affirm the trial court's orders.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

Maryanne and Joseph were married in 1983, and separated in September 2000. The parties had three children. Maryanne filed a petition for divorce in Wyoming in November 2000.

Pursuant to a marital settlement agreement (MSA) that the parties entered into in Wyoming, the parties agreed to share joint custody of the children, who were minors at the time the divorce petition was filed. Maryanne and Joseph also agreed that Joseph would pay Maryanne child support in the amount of $8,500 per month for all three children (and not less than $4,000 per month for one child)—an amount that was based on Joseph's gross income of more than $800,000 per year related to his position at Stratagene Holding Corporation, Inc. (Stratagene), a company that Joseph founded. The child support was to commence in July 2002 or the first day of the month in which Maryanne and the children moved to San Diego, California. Joseph also agreed to pay Maryanne $12,000 per month in nonmodifiable spousal support for 120 months.

---

[3] This contention arises from Joseph's appeal in case No. D058611, which is an appeal from a separate order of the trial court. The appeal in case No. D058611 has been consolidated with case No. D057677 for disposition.

The MSA was made a judgment of the Wyoming court on March 28, 2003. The parties subsequently registered the MSA with the San Diego County Superior Court, and it was established as a judgment on November 21, 2005.[4]

## B. *Procedural background*

### 1. *Maryanne's motion to modify custody of the remaining minor child, modify child support, award attorney fees, and establish spousal support arrears*

On August 24, 2007, Maryanne filed an order to show cause (OSC) seeking to modify the child custody and visitation arrangement for the parties' minor son, who was 14 years old at the time. Maryanne also requested modification of child support, as well as attorney fees, and payment of spousal support arrears.

The parties retained Tony Yip as a joint expert to perform an analysis of the parties' income and assets.

Maryanne filed a schedule of assets and debts in July 2008, which showed that she had no debt, and that she had $14,237,593 in assets. In an income and expense declaration dated August 1, 2008, Maryanne indicated that she had $13.5 million in assets and $43,214 in monthly expenses.

Joseph's income and expense declaration demonstrated that he had sold Stratagene and no longer held his position at the company. His average monthly income included $10,980 in salary, $224,867 in dividends and interest, and $426,556 in investment and ordinary losses. Joseph listed his monthly expenses as $62,539.

Yip prepared an initial report in which he presented Joseph's income in two different ways, the first of which included Joseph's net losses from a number of startup companies that he founded after selling his interest in Stratagene, and the second of which excluded those losses. Joseph objected to the second approach, and suggested to Yip that taking an approach that excluded his net losses would constitute "professional malpractice." Joseph threatened Yip's firm with a lawsuit for damages that Joseph might suffer as a result of Yip's report.

Yip's firm appeared ex parte before the trial court, seeking guidance as to how to present Joseph's income in the report. The trial court ordered that Yip

---

[4] The MSA provided, "Upon the relocation of Wife and the minor children to San Diego County, all such mediation and/or Court proceedings shall be brought only within San Diego County, California, and, except as herein stipulated by the parties, be conducted pursuant to the laws of the State of California."

could present his report as Yip deemed necessary, and specifically, that Yip could include alternative approaches to determining Joseph's income.

In the final report, Yip noted that Joseph had received in excess of $100 million, before taxes, from the sale of his interest in Stratagene when he sold the company in 2007. Joseph used those funds for a number of purposes, including making capital contributions to several new startup companies, purchasing real property, paying down mortgages, and paying income taxes. Joseph placed the remainder of the proceeds from the sale of Stratagene in various investment accounts. His portfolio balance as of December 31, 2008, was $63.6 million.

With respect to the companies that Joseph started in 2007, Yip noted that the companies experienced significant operating losses in 2007 and 2008. In Yip's final report, Yip presented Joseph's income using the same two methods that he had used in his initial report. Applying the first method to calculate Joseph's income, Yip included both income and losses from Joseph's startup companies between June 2007 and December 2008. Using this method, Joseph had a net monthly loss of $9,100 in 2007, and a net monthly loss of $235,600 in 2008. Applying the second method, Yip excluded the losses from Joseph's startup companies. Under this method, Joseph had a net monthly income of $320,800 in 2007, and $229,100 in 2008.

Yip did not analyze the detailed expenses of the startup companies for possible personal and/or nonrecurring expenses. Yip explained that the reason he did not analyze the expenses was because he determined that if the trial court decided to include the $5.69 million in net losses over the relevant period for purposes of calculating support, then Joseph would have a net loss of $2.8 million in 2008 as the basis for support, and the "[a]dd backs" of personal and/or nonrecurring expenses, if they existed, would not result in a net positive number.

In addition to the income and/or losses from Joseph's startup companies, Joseph had interest and dividend income of $1.9 million from June to December 2007, and $2.35 million from January to December 2008.

### 2. Maryanne's motion to compel and request for sanctions

In October 2008, Maryanne filed a motion to compel the production of documents and other information, and a request for sanctions against Joseph in the amount of $125,000. The request for sanctions was based, for the most part, on Joseph's "refus[al] to produce . . . information and documents, and for providing false, evasive and misleading discovery responses to the parties' joint expert and Respondent's counsel." Among the things that

Maryanne complained of in her request for sanctions was that Joseph failed to disclose that he received more than $3 million in income during 2006, failed to disclose that he received more than $9 million in cash between January and June 2007 from the sale of Stratagene stock, and failed to disclose that he received more than $100 million in cash from the sale of his interest in Stratagene.

### 3. *Yip's testimony*

At the hearing, Yip testified about his final report, and explained the two different methods that he used to calculate Joseph's income for purposes of the report. Yip agreed that the expenses that appeared in Joseph's accountings for his startup businesses were current operating expenses, and said that he had no reason to believe that the expenses were not legitimate business expenses. Yip also testified that he assumed that Joseph was operating all of the businesses with the intent of making them profitable, and that he understood the expenses to be "start-up" expenses not because they fit a particular Internal Revenue Code definition of a "start-up" expense, but because he viewed the companies as being at an early stage in their development. Yip further explained that he did not assume that Joseph was engaging in any of the businesses as a hobby or tax shelter.

Yip did not examine any of the particular expenses reported by the companies. Instead, he considered and included all of the expenses under the first method for calculating Joseph's income, and excluded all of the expenses under the second. Using the first method, Joseph's income was negative.

### 4. *The court's January 29, 2010 order*

In addressing the parties' contentions with respect to Maryanne's various requests, the trial court issued a lengthy statement of decision and order that covered a number of topics. Of relevance to this appeal are the court's comments with respect to modification of child support, sanctions against Joseph, and attorney fees and costs awarded to Maryanne. The trial court declined to consider the operating expenses of the startup companies in determining Joseph's income for purposes of calculating child support, and increased child support from $4,000 per month to approximately $18,000 per month. In addition, the trial court determined that Joseph had engaged in conduct that frustrated settlement and furthered the litigation, and that he had also breached his fiduciary duties to Maryanne by failing to disclose material changes to his income, beginning in 2006 and continuing throughout the litigation. Finally, with respect to attorney fees and costs, after noting that "Joseph retains 80% of the parties' combined incomes and approximately 85% of the combined liquid assets," the trial court ordered Joseph to pay $200,000 in attorney fees and costs to Maryanne.

5. *Maryanne's request for pendente lite attorney fees and costs to defend against Joseph's appeal from the trial court's January 29, 2010 order*

On August 16, 2010, Maryanne filed a request for an additional $60,000 in pendente lite attorney fees and $250 in costs to defend against Joseph's appeal. According to Maryanne, because Joseph appealed the order of the trial court, he had not paid her any of the $18,030 in current child support, $414,444 in child support arrears, $200,000 in attorney fees, or $75,000 in sanctions that the trial court had ordered, but instead, posted a cash undertaking to stay the order for those amounts.

Maryanne attached an income and expense declaration in which she stated that her only income derived from dividends and interest on her investments. For the month prior to her request for pendente lite attorney fees, that income had been in excess of $50,000. Maryanne estimated her assets to be approximately $11.5 million, of which $8.5 million were liquid assets. Maryanne indicated that she was remarried, but declined to state her husband's income. Maryanne's expenses were listed as $60,527 per month.

Maryanne's trial attorney filed a declaration stating that it had cost $4,143 to prepare the motion for pendente lite attorney fees, and that his firm would be required to spend approximately 30 hours assisting appellate counsel in drafting Maryanne's respondent's brief on appeal. Maryanne's appellate counsel declared that he was a certified appellate specialist and certified family law specialist, and estimated that it would take him approximately 160 hours to defend Joseph's appeal. He requested a pendente lite award of $60,000, and asked the court to retain jurisdiction over the issue of appellate attorney fees and costs, given the potential for further complications.

Joseph's income and expense declaration listed cash and checking accounts valued at $207,208, and stated that the value of his stocks, bonds and other assets that he "could easily sell" was $51.63 million. Joseph stated that the value of his less liquid assets was $16.28 million, for a total asset value of more than $68 million. Joseph's estimated expenses were listed as $393,253 per month, including business expenses of $330,003 per month.

On November 9, 2010, the trial court[5] granted Maryanne's request for pendente lite attorney fees and costs on appeal, and ordered Joseph to pay Maryanne $60,000 as a contribution to her appellate attorney fees and costs, pursuant to sections 2030 and 2032. Joseph filed a timely notice of appeal

---

[5] Judge Bostwick ruled on Maryanne's original request to modify child support and her request for sanctions and attorney fees, while Judge Longstreth ruled on Maryanne's request for pendente lite attorney fees and costs.

with respect to the court's order requiring him to pay Maryanne $60,000 in pendente lite attorney fees and costs.

## III.

## DISCUSSION

A. *The trial court did not err in determining Joseph's income for purposes of setting child support*

Joseph contends that the trial court "never calculated guideline support pursuant to the [Family] Code" (underscoring omitted) because, according to Joseph, the court excluded "bona fide business expenses" and, therefore, the court "calculated child support based on only the positive numbers." Joseph asserts that the expenses shown on his profit and loss statements were required for the operation of his good faith businesses, and that the court had no legal basis for excluding those business expenses from its calculation when it determined his income. What Joseph fails to acknowledge is that the court had discretion under subdivision (b) of section 4058 to consider Joseph's "earning capacity," rather than his actual income, for purposes of calculating guideline child support. It appears from the court's discussion of the child support issue that this is precisely what the court did when it elected not to consider the expenses from Joseph's startup businesses in calculating child support.

1. *Additional background regarding the trial court's order with respect to whether to consider or exclude Joseph's business expenses in determining child support*

The court noted that the existing child support order was based on Joseph having an annual gross income of $800,000. The court found that Joseph's sale of Stratagene constituted a substantial change in his financial circumstances because that sale netted him approximately $100 million. In 2008, after the sale of Stratagene, Joseph's non-real-property investment portfolio, alone, generated unearned income of more than $2.35 million.

The court then considered the losses that Joseph suffered as a result of the startup businesses that he formed after he sold Stratagene. The court quoted section 4058, subdivision (a), and also cited and explained the case of *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070 [88 Cal.Rptr.3d 766] (*Berger*). The court noted that Yip had calculated Joseph's 2008 income in two different ways: (1) including the losses from the startup businesses and (2) excluding those losses.

The court observed that the difference in Joseph's monthly income when calculated using these two methods was "dramatic." Excluding the losses from the startup companies, Joseph's monthly income in 2008 was $229,100; if those losses were included, Joseph's monthly income that year would be negative $235,600. The court concluded that although Joseph was not deferring the receipt of a salary, like the husband in *Berger*, Joseph was "ask[ing] this court to shield a portion of his income from support."

The court noted that Joseph maintained "an affluent, even wealthy lifestyle despite those business losses," and went on to describe the multiple homes that Joseph owns: a multimillion dollar house that Joseph purchased in Las Vegas in 2007 and a $1.8 million ranch that Joseph purchased in San Marcos in 2009. The court further noted that Joseph continued to use private jets for international travel. The court observed, "Joseph's losses have not hampered his lifestyle."

With respect to Joseph's income, the court ultimately concluded:

"Joseph may not voluntarily prefer his businesses to his child's right to receive current support in accordance with Joseph's abilities. Joseph may not invest in businesses and thereby minimize his support obligation while he maintains a wealthy lifestyle. Joseph may not divest himself, in whole or in part, of his earning ability at the expense of his minor child. Joseph may not take a break from his child support obligation in favor of his business investments. *Marriage of Berger, supra*, at 1082 and 1083. In short, as the court in *Berger* determined, Joseph 'cannot unilaterally, and voluntarily, arrange his business affairs in such a way as to effectively preclude his children from sharing in the benefits of his current standard of living.' *Marriage of Berger, supra*, at 1082.

"This court is mindful of the mandate of [section] 4058[, subdivision] (a)(2) to deduct business expenses in the calculation of gross income. Joseph strongly makes this argument. However, that statute, which far predates *Berger*, does not compel the court to deduct losses from business investments to enable a parent to prefer his business investments to his support responsibility for a season while that parent maintains a wealthy lifestyle. To do so would enable Joseph or any parent to voluntarily divert income otherwise available for support to various start-up businesses, live extravagantly off sizeable assets, and plead poverty at the support hearing. See *Marriage of Berger, supra*, at 1073. To apply that statute in this manner would create the impermissible irony *Berger* described of enabling Joseph, 'who does not need a job to support himself in the short term—as a less wealthy man would—to spin that into the justification for granting him a break from the obligation to support his family.' *Marriage of Berger, supra*, at 1086.

"Therefore, the court declines Joseph's request to deduct from his income any of the business losses."

## 2. *Standards of review*

"The standard of review for an order modifying a child support order is well established. '[A] determination regarding a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the record below.' [Citations.] Thus, '[t]he ultimate determination of whether the individual facts of the case warrant modification of support is within the discretion of the trial court. [Citation.] The reviewing court will resolve any conflicts in the evidence in favor of the trial court's determination. [Citation.]' [Citation.]" (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1233–1234 [58 Cal.Rptr.3d 877] (*Williams*).)

However, "the trial court has 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . .' [Citation.] Furthermore, 'in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.] In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support. [Citations.]' [Citation.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283 [111 Cal.Rptr.2d 755] (*Cheriton*).)

## 3. *The child support guidelines, generally*

■ "California has a strong public policy in favor of adequate child support. [Citations.] That policy is expressed in statutes embodying the statewide uniform child support guideline. (See . . . §§ 4050–4076.) 'The guideline seeks to place the interests of children as the state's top priority.' (§ 4053, subd. (e).) In setting guideline support, the courts are required to adhere to certain principles, including these: 'A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life.' (§ 4053, subd. (a).) 'Each parent should pay for the support of the children according to his or her ability.' (§ 4053, subd. (d).) 'Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children.' (§ 4053, subd. (f).)" (*Cheriton, supra*, 92 Cal.App.4th at p. 283, fn. omitted.)

■ "To implement these policies, courts are required to calculate child support under the statutory guidelines. (See §§ 4052–4055.) '[A]dherence to

the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes. (§§ 4052, 4053, subd. (k); [citation].)' [Citation.] The guideline amount of child support, which is calculated by applying a mathematical formula to the parents' incomes, is presumptively correct. [Citations.]" (*Williams, supra,* 150 Cal.App.4th at p. 1237.) For example, section 4057 provides in pertinent part: "(a) The amount of child support established by the formula provided in subdivision (a) of Section 4055 is presumed to be the correct amount of child support to be ordered. [¶] (b) The presumption of subdivision (a) is a rebuttable presumption affecting the burden of proof *and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case,* consistent with the principles set forth in Section 4053, because one or more of the following factors is found to be applicable by a preponderance of the evidence, and the court states in writing or on the record the information required in subdivision (a) of Section 4056 . . . ." (Italics added.)

A deviation from the guideline amount may be appropriate where "[a]ppli-cation of the formula would be unjust or inappropriate due to special circumstances in the particular case." (§ 4057, subd. (b)(5).) The statute provides a nonexhaustive list of some examples of special circumstances that might call for deviation from the guideline calculation, including, for ex-ample, cases in which parents "have different time-sharing arrangements for different children," or where the parents have substantially equal time-sharing, but one parent "has a much lower or higher percentage of income used for housing than the other parent." (*Ibid.*)

4. *Calculating annual gross income for purposes of determining guideline support*

Section 4058 sets forth the manner by which a trial court is to ascertain a parent's income for purposes of determining the guideline child support amount. This section provides:

"(a) The annual gross income of each parent means income from whatever source derived, except as specified in subdivision (c) and includes, but is not limited to, the following:

"(1) Income such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compen-sation benefits, unemployment insurance benefits, disability insurance ben-efits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish a child support order under this article.

"(2) Income from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business.

"(3) In the discretion of the court, employee benefits or self-employment benefits, taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts.

"(b) The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children.

"(c) Annual gross income does not include any income derived from child support payments actually received, and income derived from any public assistance program, eligibility for which is based on a determination of need. Child support received by a party for children from another relationship shall not be included as part of that party's gross or net income."

■ " '[I]ncome is broadly defined for purposes of child support. [Citations.] Subject to certain statutory exceptions . . . [annual] gross income "means income from whatever source derived . . . ." [Citation.] Although [section 4058] specifically lists more than a dozen possible income sources, by the statute's express terms, that list is not exhaustive. [Citations.] Rather, the codified income items "are by way of illustration only. Income from other sources . . . should properly be factored into the 'annual gross income' computation. [Citations.]" ' [Citation.] 'The judicially recognized sources of income cover a wide gamut.' [Citation.]" (*M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 553–554 [97 Cal.Rptr.3d 812], fn. & italics omitted.)

■ In determining a parent's income for purposes of calculating guideline child support, a trial court may choose to follow the guidance of subdivision (a) of section 4058, by utilizing the factors identified in subdivision (a)(1) through (3) to determine a parent's actual income, *or* the court may, in its discretion, impute to that parent an income different from his or her actual income—i.e., an income amount that corresponds with that parent's earning capacity. Thus, a trial court may ultimately calculate the guideline child support amount by using, as the income factor in its support calculation, either (1) the parent's actual income, as calculated under section 4058, subdivision (a) *or* (2) the parent's imputed income, as authorized by

section 4058, subdivision (b), if the court determines that imputing income to the parent would be more appropriate and would better serve the child's best interests.[6]

### 5. *Use of a parent's assets in calculating child support*

Regarding a parent's assets, the Supreme Court has stated, "Assets at the time of dissolution play little part in the computation of child support. They may enter indirectly into the calculation in two ways: (1) In assessing earning capacity, a trial court may take into account the earnings from invested assets (see, e.g., [*Cheriton, supra,*] 92 Cal.App.4th [at p.] 292 . . .); and (2) a court may deem assets a 'special circumstance' (. . . § 4057, subd. (b)(5)) that may justify a departure from the guideline figure for support payments [citation]. But these are exceptional situations; the child support obligation is based primarily on actual earnings and earning capacity." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 671 [3 Cal.Rptr.3d 390, 74 P.3d 166].)

With respect to assessing earning capacity, the court in *Cheriton* determined that the trial court had erred in failing to include the father's gross proceeds of $9.75 million from his exercise of stock options and sale of stock in determining the father's income. (*Cheriton, supra,* 92 Cal.App.4th at p. 289.) By refusing to consider the father's substantial wealth in setting child support, the trial court had effectively permitted him to avoid his obligation to support his children according to his " 'ability,' " his " 'circumstances and station in life,' " and his " 'standard of living.' (§ 4053, subds. (d), (a), (f).)" (*Cheriton, supra,* at p. 292, fn. omitted.) The *Cheriton* court concluded that "the trial court's refusal to consider [the father's] substantial wealth in setting child support may have resulted in an order that is too low to be in the best interests of his children, based on an assessment of their reasonable needs," and remanded the matter for the purpose of allowing the trial court to "[a]t the very least, . . . consider imputing reasonable income on [the father's] assets, pursuant to section 4058, subdivision (b), to the extent necessary to meet the children's reasonable needs." (*Cheriton, supra,* at p. 292.)

---

[6] When the income of a parent does not adequately reflect that parent's earning capacity and station in life, a trial court has at least two possible avenues for addressing this income-related "special circumstance." Under one scenario, the court may determine that parent's actual income, derived pursuant to section 4058, subdivision (a), which it would then use to calculate the guideline support amount. If the result of this calculation does not accurately reflect that parent's financial circumstances (and the resulting guideline support amount would therefore be unjust or inappropriate given that parent's actual wealth), the court may deviate from the guideline support amount pursuant to section 4057, which permits a court to deviate from the guideline support amount if the court determines that the formula would be unjust or inappropriate in the particular case. Alternatively, the court could exercise its discretion under subdivision (b) of section 4058 to use a different income amount, based on imputed income that is consistent with that parent's earning ability.

■ Thus, "where the supporting party has chosen to invest his or her funds in non-income-producing assets, the trial court has discretion to impute income to those assets based on an assumed reasonable rate of return. [Citations.]" (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1373–1374 [40 Cal.Rptr.3d 910], fn. omitted; see also *In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 755–756 [57 Cal.Rptr.3d 274] [court did not abuse discretion in imputing 3 percent rate of return on stock market portfolio]; *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1453–1454 [89 Cal.Rptr.2d 874] [based on statute and case law, a trial court may impute income based on interest that could be earned from investment of a lump-sum inheritance].)

### 6. *Analysis*

Joseph maintains that the trial court was required to consider the operating expenses of his newly formed businesses in determining his annual gross income for purposes of calculating a guideline child support amount. Joseph relies specifically on subdivision (a)(2) of section 4058 in contending that the trial court should have "reduced" the income that he received each month by the monthly expenditures that were necessary to operate his new companies. Joseph essentially contends that the trial court calculated his income incorrectly for purposes of determining the guideline support amount. According to Joseph, the court deviated from the appropriate guideline calculation (which, under Joseph's theory, would have resulted in Maryanne owing *him* child support), without making the findings that are required before a court may deviate from the guideline support amount under section 4057. Joseph's argument is premised on the notion that the trial court had no authority to utilize an income amount that did not include the losses he suffered as a result of the operating expenses of his startup businesses. We disagree that the trial court erred in calculating Joseph's income.

■ Although section 4058, subdivision (a)(2) provides that gross receipts from a business are to be reduced by expenditures required for the operation of the business in calculating income under subdivision (a) of that section, subdivision (b) of section 4058 provides a trial court with discretion to determine a parent's annual gross income on a basis *different from that parent's actual income*. Pursuant to subdivision (b), the court "may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." Thus, although subdivision (a) of section 4058 instructs the trial court to deduct the operating expenditures of a parent's business in determining that parent's actual income, the court *is not required to utilize a parent's actual income* in setting child support if it determines that the parent's actual income does not reflect that parent's earning capacity. The trial court thus was not required to use

Joseph's actual income in the guideline support formula, as Joseph's argument suggests. Rather, it was within the court's discretion to consider Joseph's *earning capacity* in lieu of his actual income.

Although the trial court did not expressly state that it was imputing income to Joseph pursuant to subdivision (b) of section 4058, it is clear that this was, in fact, what the court did when it declined to include the losses caused by the operating expenses of Joseph's startup companies in calculating Joseph's income. The court rejected the use of Joseph's *actual* income as calculated under section 4058 subdivision (a), in favor of a calculation of income that was based, at least in part, on an amount that the court determined was fair to impute to Joseph in view of his decision to invest in companies that would predictably operate at a loss for some period of time, rather than investing in income-producing assets.

Indeed, by not taking into consideration the operating expenses of Joseph's startup companies in determining Joseph's income for purposes of calculating the guideline support amount, the trial court effectively imputed a net zero income to Joseph with respect to these companies, rather than allowing him to take a "loss" from the operating expenses from these companies. The only error in the trial court's analysis of this issue, if any, was that it did not articulate that it was effectively proceeding pursuant to the discretion granted the court under subdivision (b) of section 4058 to adjust the income calculation to reflect Joseph's earning capacity, rather than simply calculating Joseph's actual income pursuant to subdivision (a) of section 4058. Despite failing to expressly state that it was attributing income to Joseph pursuant to subdivision (b), the court employed language pertaining to imputing income that is nearly identical to the language used in section 4058, subdivision (b), in commenting that Joseph "may not divest himself, in whole or in part, of his *earning ability* at the expense of his minor child." (Italics added.) As we will explain further, it was within the court's discretion to attribute income to Joseph under section 4058, subdivision (b) rather than calculating his income under subdivision (a).

■ "The strong public policy in favor of providing adequate child support has led to an expansive use of the earning capacity doctrine in setting the level of support when consistent with the needs of the child. [Citation.]" (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1391 [111 Cal.Rptr.2d 487] (*Destein*).) *Destein* and subsequent cases have made clear that a trial court has discretion to consider not only a parent's earning capacity with respect to income from labor, but also "to impute a reasonable rate of return on the supporting parent's underutilized or non-income-producing investment *assets* in order to calculate guideline child support in the best interests of the child." (*Williams, supra*, 150 Cal.App.4th at p. 1239, italics added.)

Thus, for example, in *Destein, supra,* 91 Cal.App.4th at pages 1390–1391, the issue was whether the trial court abused its discretion in imputing to the father "a hypothetical rate of return on his real estate investments when those investments do not produce income and would need to be liquidated to do so." Citing section 4058, subdivision (b), the *Destein* court found no error, noting that "[t]he only statutory limitation on the court's discretion to apply the earning capacity doctrine to investment assets is the best interests of the child." (91 Cal.App.4th at p. 1394.) According to the *Destein* court, there was no legal bar to attributing income to assets that were allocated for growth rather than income, and the trial court was permitted to address the difference in the parties' living standards by imputing income from the father's real estate investments. (*Id.* at pp. 1395, 1397.) The *Destein* court concluded that attributing a 6 percent rate of return on the equity in the father's assets, pursuant to the opinion of the mother's accounting expert, was reasonable. (*Id.* at pp. 1397–1398.)

Similarly, in *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150 [90 Cal.Rptr.2d 159] (*Dacumos*), the appellate court considered whether it would be proper to attribute income to a father's non-income-producing assets. (*Id.* at pp. 153–154.) The father owned two rental properties, which he was renting at a loss. (*Id.* at p. 153.) The *Dacumos* court determined that the trial court had not erred in imputing income to the rental properties, noting that "[the] broader definition of earning capacity *to include income that could be derived from income-producing assets as well as from work* is in accord with . . . legislative intent." (*Id.* at pp. 154–155, italics added.) In reaching this conclusion, the court reasoned that "[j]ust as a parent cannot shirk his parental obligations by reducing his earning capacity through unemployment or underemployment, he cannot shirk the obligation to support his child by underutilizing income-producing assets." (*Id.* at p. 155.)

Expanding upon this approach to the determination of a parent's income, the court in *Williams, supra,* 150 Cal.App.4th at page 1241, determined that a trial court acted within its discretion under section 4058, subdivision (b) in "implicitly determin[ing] that the children's best interests would be served by an increase in guideline child support, calculated in part by attributing an assumed 3 percent rate of return on [father's] investment assets." The *Williams* court explained, "To ensure that child support orders are made in the best interests of the children, section 4053, which provides for implementation of the statewide uniform guidelines for child support, 'gives a court great latitude in applying its principles to individual cases. In outlining relevant considerations, the Legislature did not limit the guidelines simply to parental income from salary, return on investment, or from any other particular source. Rather, it adopted the broader concepts of station in life, ability to pay, and standards of living.' [Citation.] Consequently, 'our Supreme Court has refused to read any limitation into a trial court's

discretion to impute income when in the child's best interests.' [Citations.]" (*Williams, supra*, at p. 1240.)

It seems clear that in declining to consider Joseph's business losses from the startup companies that Joseph formed after he obtained more than $100 million in cash from the sale of his interest in Stratagene, the trial court was preventing Joseph from "shirk[ing]" his obligation to support his child "by underutilizing income-producing assets" (*Dacumos, supra*, 76 Cal.App.4th at p. 155). The money that Joseph received from his sale of Stratagene could have produced income; indeed, Joseph has invested a large portion of those funds and earns significant returns on his investment portfolio. Joseph *chose* to invest a significant portion of the proceeds from the sale of his company in assets that did not produce income during the second half of 2007 and all of 2008, and in fact, operated at a loss during the relevant time period.

Under section 4058, subdivision (b) and relevant case law, the trial court could have imputed positive income to Joseph for the cash assets that he chose to use to make capital outlays and to pay operating expenses for his various startup business ventures rather than investing that money in income-producing assets that would earn income similar to the income his investment portfolio earned during the same time period. The court thus could reasonably have imputed the same percentage return on the money Joseph earned from his investment portfolio to the money that Joseph chose to invest in his startup companies. From this perspective, it was certainly reasonable for the court to do what it appears to have done here, which was to implicitly impute a 0 percent return on the money Joseph invested in the startup companies. In essence, by not allowing Joseph to deduct the operating expenses of his newly formed companies from his actual income, the court was imputing no income to Joseph based on the cash that he invested in those companies, and disallowing any claim that Joseph's income was negative.

The language that the trial court used in its order demonstrates that the court was attempting to determine Joseph's *earning capacity* rather than accepting Joseph's representation that although he had assets with a value in excess of $60 million and continued to maintain his wealthy lifestyle, for purposes of calculating child support, his income was negative. For example, the court stated: "Joseph may not voluntarily prefer his businesses to his child's right to receive current support *in accordance with Joseph's abilities*. Joseph may not invest in businesses and thereby minimize his support obligation while he maintains a wealthy lifestyle. Joseph *may not divest himself, in whole or in part, of his earning ability* at the expense of his minor child. Joseph may not *take a break from his child support obligation* in favor

of his business investments." (Italics added.) These statements, and particularly the court's use of the words "earning ability," show that the court was focusing on the crux of subdivision (b) of section 4058—i.e., a parent's "earning capacity."

The court thus essentially gave Joseph the benefit of the doubt with respect to Joseph's new investments by not imputing to him any positive income from the capital outlays that Joseph invested in those startup businesses—income that Joseph could have had if he had made a different decision with respect to how to invest the money that he invested in these startup companies. The trial court did not abuse the discretion granted it pursuant to subdivision (b) of section 4058 in determining that Joseph's choice to invest his considerable wealth in startup companies that were operating at a loss should not undermine his dependent child's right to receive current support in accordance with Joseph's earning capacity.

Joseph takes issue with the trial court's reliance on *Berger, supra,* 170 Cal.App.4th 1070, and attempts to distinguish *Berger,* pointing out that the father in *Berger* "was voluntarily deferring his own income," while Joseph's "bona fide business expenses, paid out in cash to third parties, are a strict statutory deduction from his income." (Italics omitted.) We agree that *Berger* is not precisely on point with this case, since the father in that case had been promised a salary that he chose to defer for a period of time in order to try to get his startup landscaping company off the ground. Earning capacity thus was not at issue in *Berger.* (See *Berger, supra,* at p. 1083.)

*Berger* is relevant to the present case, however, to the extent that it discusses a parent's obligation not to voluntarily act in a way that negatively impacts the support that a child is entitled to receive from that parent. This case, like *Berger,* involves an unusual situation in which considering a parent's actual monthly income would not reflect the true nature of the parties' relative lifestyles and wealth. Like the husband in *Berger,* Joseph has sufficient wealth to enable him to choose to spend some of his capital on starting up a handful of new business ventures, all of which he expects will operate at a loss in the short term, but will bring him income in the future. As the trial court noted, Joseph continues to maintain his very wealthy lifestyle, despite the "losses" from his business ventures.[7] Given the net value of Joseph's assets, it is clear that his net worth is far greater than Maryanne's. Thus, as in *Berger,* it would be ironic to allow Joseph's wealth—"wealth which gives him the freedom to make [a] decision" (*Berger, supra,* 170

---

[7] Joseph's companies were paying for, or "lending" Joseph money for, certain of his expenses. For example, Joseph borrowed $4,000 monthly from Biosense Partners, LP, to pay support to Maryanne. In addition, the businesses paid other of Joseph's "personal expenses," including "use of the Del Mar home" and "use of Land Rovers in Las Vegas and San Diego."

Cal.App.4th at p. 1085) to invest in ventures that operate at a loss for some period of time—"to be spun into the justification for granting him a break from the obligation to support his family" (*ibid.*), irrespective of the merits of those new ventures.

B. *Because the court erroneously concluded that Joseph had a fiduciary duty to disclose to Maryanne material information about changes in his income after a final child support order had been entered and sanctioned Joseph, in part, for violating that fiduciary duty, the sanction order must be reversed; the court must reconsider sanctions on remand*

The trial court awarded Maryanne sanctions in the amount of $75,000 pursuant to sections 271 and 2107, which authorize the court to impose sanctions in family law proceedings. Joseph contends that the sanction award was based, in part, on the court's erroneous conclusion that Joseph owed Maryanne a fiduciary duty to provide her with material facts and information regarding his income after there was a final judgment of dissolution of their marriage.

1. *Additional background regarding the court's sanction award*

The parties requested sanctions against each other, and the trial court addressed both parties' requests. However, because Joseph does not appeal the trial court's denial of his request for sanctions against Maryanne, we do not describe the court's ruling in this respect. Rather, we describe the court's ruling only with respect to Maryanne's request for sanctions against Joseph, which the trial court granted, and which Joseph challenges on appeal.

The trial court noted that Maryanne sought sanctions against Joseph under section 271 "for behavior that frustrated settlement and furthered the litigation," and also under sections 721 and 2102 "for breaches of fiduciary duties for failing to disclose material changes in his income beginning 2006, failing to disclose material facts about his income from the date of her filing in August 2007 to the date of formal discovery in March 2008, failing to produce material information and documents concerning various trusts, providing misleading financial and tax information, providing misleading information regarding BSP[8] and the use of funds from BSP to pay child support."

Joseph had argued that he no longer owed Maryanne any fiduciary duties, since the two were no longer married and there was a final judgment in their

---

[8] Although the trial court does not define the acronym "BSP" in its order, it appears from the record that the trial court was referring to Biosense Partners, LP, which Joseph owns through a trust and a limited liability corporation.

marital dissolution case. The court explained that despite Joseph's protestations to the contrary, the court was of the view that Joseph continued to owe Maryanne a fiduciary duty to disclose material information pertaining to his income and expenses even after the Wyoming divorce decree was entered. The court stated, "[Section] 2102[, subdivision] (c) must be interpreted to apply until the court loses jurisdiction to make a child support order because the order for child support '(1) is terminated by the court or (2) terminates by operation of law pursuant to Sections 3900, 3901, 4007, and 4013.' [Citation.] Therefore, Maryanne's interpretation of [section] 2102[, subdivision] (c) is consistent to the statutory intent; Joseph's is not." The court concluded that "the fiduciary duties outlined in [section] 2102[, subdivision] (c) continued in this case after the entry of the Wyoming decree; and, because [the parties' son] was and is at all times herein, an unemancipated minor child of the parties, the fiduciary duties have at all times herein remained in effect and are presently in effect between Maryanne and Joseph."

Based on its conclusion that the parties continued to owe each other fiduciary duties, and in particular, a fiduciary duty to disclose all material changes to their incomes and expenses, the court determined that Joseph had "breached his fiduciary duties to Maryanne." Specifically, the court found that Joseph had failed to disclose various material facts and information regarding his income prior to Maryanne seeking formal discovery of those matters, and also found that Joseph had used a variety of intimidation tactics throughout the litigation. The court concluded, "The court therefore finds Joseph's failure to provide information to Maryanne about the Stratagene sale, the failure to provide Maryanne copies of the J.A. Sorge Trusts I–IV documents and Joseph's intimidation tactics in this matter *violated his fiduciary duties to Maryanne* and fueled the litigation in this matter. Therefore, Maryanne's motions are granted and she is awarded $75,000 in sanctions pursuant to [section] 2107 and [section] 271. The court does not find sufficient evidence to warrant sanctions on any of the other facts argued by Maryanne." (Italics added.)

### 2. *Relevant legal standards*

#### a. *Provisions regarding fiduciary duties owed between parties in a dissolution action*

Section 2100 sets out the legislative policy behind the disclosure requirements between parties to a marital dissolution action. In that section, the Legislature explains that "[i]t is the policy of the State of California (1) to marshal, preserve, and protect community and quasi-community assets and liabilities that exist at the date of separation so as to avoid dissipation of the community estate before distribution, (2) to ensure fair and sufficient child

and spousal support awards, and (3) to achieve a division of community and quasi-community assets and liabilities on the dissolution or nullity of marriage or legal separation of the parties as provided under California law." (§ 2100, subd. (a).) "In order to promote this public policy, a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties, regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties. Moreover, each party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes so that at the time the parties enter into an agreement for the resolution of any of these issues, or at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts." (§ 2100, subd. (c).)

Subdivision (c) of section 2102 provides: "*From the date of separation to the date of a valid, enforceable, and binding resolution of all issues relating to child or spousal support and professional fees*, each party is subject to the standards provided in Section 721 as to all issues relating to the support and fees, including immediate, full, and accurate disclosure of all material facts and information regarding the income or expenses of the party." (Italics added.)[9]

### b. *Provisions regarding sanctions*

Section 2107, subdivision (c) requires the trial court to impose monetary sanctions and to award reasonable attorney fees if a party fails to comply with any portion of the chapter of the Family Code that deals with a spouse's

---

[9] Section 721 provides:

"(a) Subject to subdivision (b), either husband or wife may enter into any transaction with the other, or with any other person, respecting property, which either might if unmarried.

"(b) Except as provided in Sections 143, 144, 146, 16040, and 16047 of the Probate Code, in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following:

"(1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.

"(2) Rendering upon request, true and full information of all things affecting any transaction which concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.

"(3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse which concerns the community property."

fiduciary duty of disclosure during dissolution proceedings. That provision provides, "If a party fails to comply with any provision of this chapter, the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party. Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (§ 2107, subd. (c).)

Similarly, section 271, subdivision (a) provides the trial court with authority to order the opposing party to pay attorney fees and costs in the nature of a sanction when "the conduct of each party or attorney . . . frustrates the policy of the law to promote settlement of litigation . . . ." That subdivision provides in full: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award." (*Ibid.*) Section 271 "advances the policy of the law 'to promote settlement and to encourage cooperation which will reduce the cost of litigation.' [Citation.]" (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 177 [110 Cal.Rptr.2d 111].)

 Together, sections 271 and 2107 "give the trial court authority to order sanctions and the payment of attorney fees for breach of a party's fiduciary duty of disclosure and for conduct which frustrates the policy of promoting settlement." (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1474 [64 Cal.Rptr.3d 29] (*Feldman*).)

### c. *Standards of review*

" 'A sanction order under . . . section 271 is reviewed under the abuse of discretion standard. " '[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order.' " ' [Citation.] 'In reviewing such an award, we must indulge all reasonable inferences to uphold the court's order.'

[Citation.] Although no case law discusses which standard of review we should apply to an order awarding sanctions under section 2107, subdivision (c), because the sanction is similar to that imposed under section 271 as well as similar to a sanction for civil discovery abuses (which are reviewed for abuse of discretion), we will apply an abuse of discretion standard to an order for sanctions under section 2107, subdivision (c). [Citation.]" (*Feldman, supra*, 153 Cal.App.4th at p. 1478, fn. omitted.)

"To the extent that we are called upon to interpret the statutes relied on by the trial court to impose sanctions, we apply a de novo standard of review." (*Feldman, supra*, 153 Cal.App.4th at p. 1479.) "We review any findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review. [Citation.]" (*Ibid.*)

### 3. Analysis

#### a. The trial court erred in determining that Joseph owed Maryanne a continuing fiduciary duty under section 2102, subdivision (c)

Joseph contends that the trial court erred in interpreting section 2102, subdivision (c) as requiring a continuing duty between divorced parents to make "immediate, full, and accurate disclosure of all material facts and information regarding the income or expenses of the party," beyond the entry of a final judgment in a dissolution action, as long as there is a child for whom a support order remains in effect.

" 'Our task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of law. [Citation.] The statutory language ordinarily is the most reliable indicator of legislative intent. [Citation.] We give the words of the statute their ordinary and usual meaning and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. [Citation.] If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, the plain meaning governs. [Citation.] If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. [Citation.]' [Citation.]" (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 288 [123 Cal.Rptr.3d 260].)

The trial court noted that section 2100 et seq. does not define the words " 'valid, enforceable, and binding resolution' of all issues relating to child or spousal support and professional fees," and, therefore, determined that it should "look[] elsewhere for guidance as to the objectives of the statute and

the legislative intent."[10] After citing the objective of the child support disclosure statutes as being the fashioning of fair and sufficient child support awards and fostering full disclosure and cooperative discovery, the trial court noted that not all disputes concerning child support involve married (or once married) parents. The trial court proceeded to conclude that if it were to agree with Joseph's argument that the Wyoming divorce decree constituted a "valid, enforceable and binding resolution" of the child support issue, then the result would be that the fiduciary duties would be "available only to parents who are still married but not to parents who were never married or who are no longer married."

According to the trial court, Joseph's argument would result in a two-class system of parents: "One class of parents would be able to effectively obtain or modify child support orders fairly, efficiently, accurately and economically where the others would have to resort to formal discovery which can have the opposite effect." Determining that the Legislature would not "create such a two-class system," the court concluded that "[t]he fiduciary duties must be available for all parents for the same duration," and "[t]o accomplish that result, [section] 2102[, subdivision] (c) must be interpreted to apply until the court loses jurisdiction to make a child support order because the order for child support '(1) is terminated by the court or (2) terminates by operation of law pursuant to Sections 3900, 3901, 4007, and 4013.' "

Noting that "child support remains at issue long after the entry of a judgment of dissolution," the trial court was of the view that there was no "valid, enforceable and binding resolution of all issues relating to child or spousal support and professional fees" under section 2102, subdivision (c) until all support obligations terminated. The trial court concluded that "to ensure fair support orders and foster full disclosure and cooperative discovery in all cases in which child support is pending, either before or after judgment, the fiduciary duties called for in [section] 2100 et seq[.] must continue as long as the issue of child support is pending, not final, or, in short, until the court's jurisdiction to order child support ends."

We disagree with the trial court's interpretation of section 2102, subdivision (c), and conclude that this subdivision *does not* impose on divorced

---

[10] The parties' only contentions related to section 2102, subdivision (c) are with respect to the question of child support, and the only question at issue was whether a "valid, enforceable, and binding resolution" of the child support issue had been made, not whether a similar resolution of the other possible issues raised in subdivision (c) of section 2102 (i.e., spousal support and professional fees) was made. We therefore limit our discussion to the question whether there was a valid, enforceable and binding resolution of child support in this case, after which the parties no longer had a continuing duty to disclose material information regarding their incomes to each other.

parties a continuing fiduciary duty to disclose all material facts regarding a party's income after a final custody and support order has been entered.

The relevant language of section 2102, subdivision (c) states that the duty of immediate, accurate and full disclosure of material facts regarding income and expenses is owed "[f]rom the date of separation to the date of a valid, enforceable, and binding resolution of all issues relating to child or spousal support and professional fees."[11]

 The terms "valid," "enforceable," and "binding" all refer to the legal strength or force of the "resolution" at issue. The definition of "resolution" that seems most applicable here is "the act of determining." (See Webster's 3d New Internat. Dict. (2002) p. 1933, col. 1.) Thus, the statute essentially requires that there be a final determination of all issues relating to child support before the parties' fiduciary duties to one another regarding disclosure of income will end. The most reasonable interpretation of what would constitute a legally effective determination of all the issues relating to child support is a *final*, as opposed to interim, temporary, or pendente lite, child support order. In other words, a child support order that the parties and/or the court have indicated is intended to be a final, permanent determination of child support represents a "valid, enforceable, and binding resolution of all issues relating to child . . . support."

 In making this determination, we take guidance from the distinction that the Supreme Court has drawn between temporary and final orders in the context of child custody. In this context, it is clear that the Supreme Court has indicated that an order may be "final" or "permanent," despite being subject to modification in the future. (See, e.g., *Montenegro v. Diaz* (2001) 26 Cal.4th 249 [109 Cal.Rptr.2d 575, 27 P.3d 289] (*Montenegro*).) We find this framework useful in considering a child support order, as well. In both the child custody and child support contexts, an order may be considered "final" or "permanent," *despite being subject to modification in the future.*

Further, interpreting the phrase "valid, enforceable, and binding resolution of all issues relating to child . . . support" to refer to a final child support order, harmonizes section 2102, subdivision (c) with other statutory provisions that would be rendered superfluous under the trial court's interpretation.

---

[11] The fact that section 2102, subdivision (c) refers to the "date of separation" indicates that this provision, by its very nature, applies only to parties who have been legally married or in registered domestic partnerships and have decided to end that legal status by instituting a dissolution action. The conclusion that section 2102 is intended to apply only to those who are married or in domestic partnerships is further supported by the fact that section 2102 falls within division 6 of the Family Code, entitled "Nullity, Dissolution, and Legal Separation." (See § 2000 ["This part applies to a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties."].)

Specifically, section 3660 et seq. sets out a framework for the exchange of financial information between parties whose dissolution proceedings are final. "[A]fter the entry of a judgment of dissolution, a custodial parent is entitled, upon written request, to an annual declaration of income and expenses from the parent paying child support, regardless of whether a notice of motion or order to show cause has been filed. (See . . . §§ 3660–3668.)" (*In re Marriage of Armato* (2001) 88 Cal.App.4th 1030, 1038 [106 Cal.Rptr.2d 395] (*Armato*).)

Section 3660 provides that "[t]he purpose of this article [(i.e., div. 9, pt. 1, ch. 6, art. 2, " 'Discovery Before Commencing Modification or Termination Proceeding' ")] is to permit inexpensive discovery of facts before the commencement of a proceeding for modification or termination of an order for child, family, or spousal support." As the *Armato* court explained, "By mandating the production of such information, the Family Code provides the parties with a means to resolve support issues without judicial intervention, *permits the parties to reassess on a periodic basis whether a modification is warranted*, discourages the filing of meritless claims for a change in support, and encourages the use of voluntary agreements to modify support payments." (*Armato, supra*, 88 Cal.App.4th at p. 1038, italics added.)

Section 3663 indicates that a party may request discovery pursuant to "this article" no more "than once every 12 months." Section 3664 provides in pertinent part: "(a) At any time following a judgment of dissolution of marriage or legal separation of the parties, or a determination of paternity, that provides for payment of support, either the party ordered to pay support or the party to whom support was ordered to be paid or that party's assignee, without leave of court, may serve a request on the other party for the production of a completed current income and expense declaration in the form adopted by the Judicial Council."

It is apparent that pursuant to section 3664, subdivision (a), a party subject to a child support order, whether it is the party ordered to pay the support or the party entitled to receive the support, has a right to make an annual request for a declaration of income and expenses from the other party. The fact that the Legislature enacted section 3664 makes it clear that the Legislature did not intend for divorced parties to continue to owe each other the same fiduciary duty to disclose all material changes in income as married persons or those in domestic partnerships do, simply because the parties share a child together and an order for the support and maintenance of that child remains in effect.

█ If we were to interpret section 2102, subdivision (c) in the manner that the trial court suggests, there would be no need to have enacted a

provision that would allow a parent to request income information under section 3664, since that party would already be entitled to have the other party provide all material facts and information related to his or her income throughout the year. We should avoid an interpretation of section 2102, subdivision (c) that would render the discovery procedures provided in section 3664 unnecessary. (See *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 345 [110 Cal.Rptr.3d 628, 232 P.3d 625] ["[W]e must avoid interpretations [of statutes] that would render related provisions unnecessary or redundant."]; see also *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54] ["[A] statute should be interpreted ' "with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' [Citation.]"].)

■ We conclude that for purposes of section 2102, subdivision (c), a "valid, enforceable, and binding resolution of all issues relating to child . . . support" means a final judicial child support determination, whether obtained pursuant to agreement of the parties or after litigation of the matter before the court. Despite the fact that a final child support determination is never truly "final" or "permanent," in the sense that it may always be modified at the request of a party who can demonstrate that changed circumstances justify a modification, for purposes of section 2102, subdivision (c), a child support order that the parties and/or the court indicate is not intended to be temporary (or interim or pendente lite) should be considered to be the final "resolution of all issues" related to child support. Thus, once a final order of child support has been entered in a dissolution case, the parties are no longer "subject to the standards provided in Section 721 as to all issues relating to the support and fees, including immediate, full, and accurate disclosure of all material facts and information regarding the income or expenses of the party." (§ 2102, subd. (c).)

> b. *A final child support determination was made upon the entry of the Wyoming divorce decree*

The parties' Wyoming divorce decree states: "The parties entered into a Marital Settlement Agreement dated June 21, 2002, the purpose of which is to make a *final and complete settlement* of all rights and obligations between the parties, including those concerning their property, *the support and maintenance of* each of them and *their children*, . . . and all other matters existing between the parties growing out of their marital relationship." (Italics added.)

By stating that the Wyoming divorce decree was to constitute the "final and complete settlement of . . . the support and maintenance of . . . their children," Joseph and Maryanne made clear their intent that this agreement,

which was reduced to a judgment, be the final support order. Further, the parties' conduct after entry of this divorce decree indicates that this was their intention. (See *Montenegro, supra,* 26 Cal.4th at p. 259 [evidence of parties' conduct following entry of ambiguous orders supported court's determination that the parties did not intend for the orders at issue to be final judgments as to custody].) Neither party sought to modify the child support order until Maryanne had reason to believe that Joseph's assets had increased significantly, thus indicating a change in circumstances warranting modification of the child support order. Thus, as of the time the Wyoming divorce decree was entered, the parties in this case were no longer required to disclose "all material facts and information regarding the income or expenses of the party" to the other pursuant to section 2102, subdivision (c). The court therefore erred in concluding that Joseph breached his fiduciary duty to Maryanne by failing to disclose to her material facts and information regarding his income, after entry of the Wyoming divorce decree.

 c. *The trial court's sanction order, which was based in part on the court's erroneous determination that Joseph had breached his fiduciary duty to Maryanne by not disclosing certain information related to his income, must be reversed and the matter remanded for further consideration by the court*

Joseph contends that because the sanction order was based, in part, on the trial court's erroneous conclusion that Joseph continued to owe Maryanne a duty to disclose all material facts and information concerning his income or expenses, the sanction order must be reversed. Maryanne contends that even if we determine that the trial court erred in concluding that Joseph breached a fiduciary duty owed to Maryanne, we may nevertheless affirm the trial court's sanction award on the ground that the award was also premised on section 271, and Joseph does not challenge the sanction award on that ground.

It is clear from the record that the trial court awarded sanctions pursuant to both section 271 and section 2102. Because the court concluded that sanctions were appropriate based at least in part on its erroneous determination that section 2102, subdivision (c) continued to apply to Joseph even after the parties had a valid, enforceable and binding resolution of all child support matters, and because it is impossible to determine from the court's sanction award what portion of the award is attributable to this erroneous conclusion, we must reverse the entire sanction award and remand for the court to determine anew what amount of sanctions it should award, if any, based on its finding that Joseph utilized various intimidation techniques

throughout the litigation.[12] (*See In re Marriage of Abrams* (2003) 105 Cal.App.4th 979, 993 [130 Cal.Rptr.2d 16], disapproved on another ground in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1097 [12 Cal.Rptr.3d 356, 88 P.3d 81] [remanding issue of sanctions because "[h]aving found merit in only one of the court's three reasons for imposing the attorney fee sanction, we cannot say with any certainty that the court necessarily would have exercised its discretion in the same fashion based only on the one valid reason"].)

## C. *The trial court did not abuse its discretion in awarding attorney fees*

### 1. *The trial court's orders with respect to attorney fees*

#### a. *The trial court's January 29, 2010 attorney fee order*

With respect to Maryanne's request for an award of attorney fees pursuant to section 2030,[13] the trial court cited the factors that the court is to consider in fashioning an award of attorney fees and costs, including the parties' respective incomes, the parties' comparative need, the parties' respective resources, the complexity of the case, the skill of counsel, the reasonableness of the fees, and any other factors affecting the parties' abilities to pay.

The court stated, "The fact that Maryanne has ample resources to pay her attorney fees does not necessarily bar an order for attorney fees and costs," noting that pursuant to California statutes and case law, a party's " 'need' is relative." The trial court then cited *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877 [69 Cal.Rptr.2d 480] (*O'Connor*), a case in which the parties had "ample resources to pay [their] attorney fees," in that the husband had $2 million in assets and the wife had $40 million in assets. The court in *O'Connor* awarded the husband $450,000 in attorney fees and costs, which the wife disputed on appeal, and the appellate court rejected the wife's argument that the party requesting attorney fees was required to show need.

---

[12] We leave the decision as to the appropriate amount of sanctions, if any, to the trial court to determine on remand, and do not intend to suggest that no sanctions are warranted or that some other sanction amount would be proper. We intend to indicate only that the trial court should not base any portion of its decision with respect to Maryanne's request for sanctions against Joseph on the notion that Joseph breached a fiduciary duty to Maryanne in not disclosing material changes in his income after a final judicial determination as to child support had been made.

[13] Joseph had also originally requested attorney fees under section 2030, but later dropped his request.

After considering the relevant factors, and noting that "Joseph retains 80% of the parties' combined incomes and approximately 85% of the combined liquid assets," the court ordered Joseph to pay $200,000 in attorney fees and costs to Maryanne.

 b. *The trial court's November 9, 2010 order with respect to Maryanne's request for pendente lite attorney fees related to the appeal*

In granting Maryanne's request for pendente lite attorney fees and costs related to Joseph's appeal, Judge Longstreth stated, "It seems to me that [where the parties were with respect to the attorney fees issue at the time the previous order was made] is still the same place we are today and the same sort of analysis that [Judge Bostwick] performed would be the kind of analysis that I would perform. I think we would be getting to pretty much the same place[,] which would support [Maryanne's] request for $60,000." The court noted that there is a "[h]uge disparity [of assets] in this case. We are talking about a disparity of [$]40 million." The court also noted that there remained a question in the court's mind concerning what the court should do when there is a huge disparity of assets, neither party has a true "need" in the sense that the attorney fees could not be paid without some contribution from the other party, but the party with the greater assets has a negative net income while the party with the lesser assets has a positive net income.[14] Judge Longstreth ultimately concluded:

"I'm hearing [Joseph's attorney's] argument as being less that there's been some change from the position of the parties since January of this year or whatever data was relied on in a January decision and more that Judge Bostwick came to an incorrect conclusion about how to assess income and so forth.

"Based on all of that, I think there is some value in consistency and decision-making across judicial officers. I'm persuaded, I think, that Judge Bostwick's conclusion or the conclusion that there should be a payment of fees from Mr. Sorge to Mrs. Sorge is easily justifiable based on the asset disparity . . . and that's even before we get to the fact about whether I would want to be recalculating or redoing what Judge Bostwick had done on income.

---

[14] The trial court noted that Joseph's argument on appeal was that the earlier order miscalculated his income and failed to acknowledge that Joseph's net income was, in fact, negative, rather than positive.

"I think it is undisputed that the amount of fees being sought, I understand [Joseph's attorney's] point that [it] is a very small percentage compared to the assets, but I think that also makes the other point, that it's reasonable [to award her $60,000 in pendente lite attorney fees and costs] given what is at stake here in the course of the litigation so far. So I think that applying the 2030 factors, I think it is appropriate to make an award to Ms. Sorge in [the] amount requested of $60,000."

### 2. Legal standards

The Family Code provides that a court may order one party to pay the attorney fees and costs incurred by the other party. At the time the trial court made the attorney fee orders, section 2030, former subdivision (a) provided:

"(1) In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.

"(2) Whether one party shall be ordered to pay attorney's fees and costs for another party, and what amount shall be paid, shall be determined based upon, (A) the respective incomes and needs of the parties, and (B) any factors affecting the parties' respective abilities to pay. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."

Additional authority regarding the making of an award of attorney fees and costs is found in section 2032, which states in relevant part:

"(a) The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.

"(b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent

relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

 Given this statutory framework, a trial court has wide discretion in fashioning an award of attorney fees in marital proceedings. (See, e.g., *In re Marriage of Lynn* (2002) 101 Cal.App.4th 120, 133 [123 Cal.Rptr.2d 611].) In assessing one party's relative need and the other party's ability to pay, the family court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investments and income-producing properties. Further, in determining whether to award attorney fees to one party, the family court may consider the other party's trial tactics. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1167 [62 Cal.Rptr.2d 466].)

On appeal, we review an attorney fee award under section 2030 for an abuse of discretion. (*In re Marriage of Drake, supra*, 53 Cal.App.4th at p. 1166.)

### 3. *Analysis*

Joseph argues that Maryanne has no need for assistance in paying her attorney fees, and, therefore, that the trial court abused its discretion when it awarded her $200,000 in attorney fees related to the litigation between the parties in the trial court. As Joseph puts it, "[t]he question is a narrow one—does a person worth $14 million, over half of which is liquid, who was already receiving in excess of $16,000 per month in spousal and child support, and who was just awarded $414,444 in retroactive child support for a child in her care 50% of the time, 'need' $200,000 in attorney fees?" Joseph goes on to say that the trial court found that Maryanne did not "need" the fees, but made the order "because Joe had a greater net worth than Maryanne." He then argues that this is not the purpose of the attorney fee award statute in the Family Code. Joseph also maintains that because the court found that "both parties' conduct contributed to the amount of the [attorney] fees" incurred by the parties, "any order other than each party pay his and her own fees is an abuse of discretion."

 Joseph's argument regarding Maryanne's "need" fails to acknowledge that the statute is concerned with *relative* need, and, thus, that the trial court may appropriately consider the fact that Joseph has a significantly greater net worth than Maryanne in deciding whether to award her some or

all of the attorney fees that she requested. Section 2032, subdivision (a) permits a court to make an award of attorney fees that are "just and reasonable under the *relative circumstances* of the respective parties." (Italics added.) Specifically, "[t]he fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested," and "[f]inancial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).)

The trial court considered the parties' relative financial circumstances and made the following findings related to the attorney fee award: (1) at that point in time Maryanne had paid $226,000 in attorney fees and costs and owed another $115,000; (2) Joseph had paid $280,000 in attorney fees and costs; (3) Maryanne had $7.5 million in liquid assets; (4) Joseph had $64 million in liquid assets; (5) Joseph possessed the bulk of the financial information that was at issue in the litigation before the court and Maryanne had the laboring oar with respect to discovery; and (6) even after Joseph pays child support, he continues to retain approximately 85 percent of the parties' combined liquid assets. All of these considerations are proper, and the court did not abuse its discretion in concluding that Joseph's wealth relative to his also wealthy ex-wife is such that an award of attorney fees to Maryanne would be appropriate under these circumstances. (See *O'Connor, supra*, 59 Cal.App.4th at pp. 883–884 [at commencement of litigation husband had approximately $4 million in assets and wife had $40 million in assets; trial court acted reasonably in awarding husband $450,000 in pendente lite attorney fees given relative circumstances of the parties and despite lack of "need" of husband].)

The same analysis applies to the trial court's award of pendente lite attorney fees to Maryanne to defend against Joseph's appeal. We therefore affirm the trial court's November 9, 2010 order regarding those attorney fees, as well.

## IV.

## DISPOSITION

The January 29, 2010 order of the trial court is reversed with respect to the award of sanctions, and the matter is remanded for further proceedings related to that issue. The January 29, 2010 order is otherwise affirmed.

The November 9, 2010 order of the trial court is affirmed.

The parties are to bear their own costs on appeal.[15]

Huffman, Acting P. J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 14, 2012, S200044.

---

[15] We do not intend to affect the trial court's pendente lite award of appellate attorney fees and costs or to bind the trial court in the event that the court determines that a further shifting of costs would be appropriate. Rather, we are merely apportioning the costs between the parties pursuant to California Rules of Court, rule 8.278(a)(3), since neither party can be considered to be the "prevailing" party on appeal.