Filed 1/3/14  Marriage of Caldwell CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of GINNY L. CALDWELL and MICHAEL J. CALDWELL. | |
| | D060879 |
| GINNY L. EDMUNDS, | |
| Appellant, | |
| | (Super. Ct. No. D537320) |
| v. | (Super. Ct. No. ED047912) |
| MICHAEL J. CALDWELL, | |
| Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.

Ginny L. Edmunds, in pro. per; and Katherine Winn for Appellant.

Stephen Temko for Respondent.

Appellant Ginny L. Edmunds appeals from orders modifying her child support and dividing omitted marital assets. Ginny[1] contends the trial court erred in making the child support award retroactive to 2010 instead of 2009, by imputing additional income to her, and by not attributing additional income to her ex-husband, Michael Caldwell. She also contends the court erred in dividing omitted assets by awarding Michael his business at zero value and by concluding that Ginny failed to meet her burden with regard to a residence and firearms. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Marriage and Dissolution*

Ginny and Michael married on July 14, 1990, and had four children together during their marriage. The couple separated in January 2000, and Ginny filed a petition for dissolution in April 2000. In May 2000 the trial court made pendente lite orders directing Michael to pay Ginny $2,433 per month in child support and $575 per month in spousal support. The couple reconciled the following month, but separated again—this time permanently—in May 2003.

In November 2003 Ginny and Michael executed a marital settlement agreement (MSA) that divided their property and resolved custody and support issues.[2] The MSA

---

[1] We refer to the parties by their first names for convenience and clarity and intend no disrespect. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475, fn. 1.)

[2] The MSA is not in the record before us, but was the subject of a prior appeal in which our unpublished decision quoted portions of the MSA. Our quotations herein from the MSA are taken from the quoted passages as they appear in our earlier decision. (*In re Marriage of Caldwell* (July 14, 2010, D055762).)

states that the "parties . . . agree that there will be no payment of child support," and both parties waived "any and all rights to spousal support." In December 2008, upon Michael's motion, the court entered the MSA as a judgment nunc pro tunc to November 26, 2003 (the date of the last signature on the agreement). A few months later, Ginny hired a new attorney who sought to set aside the judgment based on the MSA. The trial court denied Ginny's challenge and we affirmed after Ginny appealed.

B. *Ginny's Order To Show Cause To Modify Child Support*

Ginny filed an order to show cause (OSC) on January 21, 2009, seeking to modify child support. Before the court heard Ginny's OSC, the parties agreed that Michael would pay $1,200 per month in child support. The court entered the stipulation as an order in August 2009. About a month later, Michael filed his own OSC to modify child support. Before the court heard Michael's OSC, the parties agreed that Michael's child support payments would be reduced to $600 per month. The court entered that stipulation as an order in September 2009.[3]

The court set a mandatory settlement conference for December 8, 2010. Due to the contentiousness of the case, however, the parties agreed to participate in a private mediation instead.

---

[3] The record does not contain Ginny's OSC, the August 2009 stipulation, the August 2009 order, Michael's OSC, the September 2009 stipulation, or the September 2009 order. The record does, however, contain declarations that refer to these documents. We have based our recitation of facts on those declarations.

At a December 15, 2010 case management conference, the court—in light of the upcoming private mediation and the intervening support awards entered in 2009—took Michael and Ginny's 2009 OSC's off calendar. The court directed the parties to file a new OSC if they wished to modify the existing support award. Ginny did so five days later.[4]

The parties conducted their private mediation in February 2011, during which they reached certain interim agreements that the court later entered as an order. The terms of the agreed-upon order included (1) continuing the hearing on Ginny's December 2010 OSC to no later than August 2011; (2) Michael paying $2,000 per month in child support until the earliest of August 31, 2011, the hearing on Ginny's December 20 OSC, or the agreement of the parties; (3) appointing an independent accountant, Chris Summers, to prepare an analysis of both parties' incomes; and (4) "reserv[ing] jurisdiction to set future child support awards effective retroactive to December 20, 2010, the date [Ginny] filed her Order to Show Cause." The order expressly provided that "[e]ach party's claim to request retroactivity to February, 2009 is preserved."

Ginny's OSC was set to be heard on August 25, 2011. Three days before the scheduled hearing, the court heard Michael's ex parte application seeking to (1) continue the hearing date on the OSC, (2) extend the $2,000 per month support payments in the interim, and (3) set December 20, 2010, as the date for retroactivity of the eventual support award. The court continued the OSC hearing to January 6, 2012, and ordered

---

[4]    Ginny's December 20, 2010 OSC is not in the record, but declarations in the record refer to it. Again, we base our recitation of facts on those declarations.

Michael to continue paying $2,000 per month in child support until then. Regarding retroactivity, the order stated that the court "shall be making child support orders retroactive to December 20, 2010, the date of [Ginny's] motion to modify child support. *An earlier date for retroactivity may be argued for at the hearing on January 6, 2012.*" (Italics added.)

Accountant Summers provided a report on Michael's income. Summers concluded Michael's income was derived from his employment at CSIdentity Corporation and his sole proprietorship, MJC Enterprises (MJC). Summers concluded MJC had "required operating expenses in excess of its revenues and does not make a profit." Accordingly, Summers opined that Michael "should be attributed zero income from this business."

Summers was unable to provide an analysis of Ginny's income because he was "not provided with any financial records upon which to base the analysis." Michael therefore hired accountant Robert Huntoon to prepare an analysis of Ginny's income, including cash flow generated by businesses owned and operated by Ginny and her family. Based on Summers's and Huntoon's reports, Michael argued in his response to Ginny's OSC that Ginny's income available for support include $3,250 in W-2 income and $5,890 in tax-free income provided in the form of personal expenses paid by the family business.

The court heard Ginny's OSC on January 6, 2012. The court received declarations, heard live testimony from Ginny and Huntoon, and heard argument from Ginny and from Michael's counsel. The court issued its findings and order after hearing on January 9, 2012. The court determined that Ginny had gross monthly income from

5

wages and salary of $2,200 and gross monthly nontaxable income of $5,890. The court found that Michael had gross monthly income from wages and salary of $12,465. Based on those findings, the court ordered Michael to pay child support of $2,009 per month retroactive to December 21, 2010, and denied Ginny's request for need-based attorney fees.

Ginny filed a notice of appeal on March 2, 2012.

C. *Ginny's OSC To Divide Omitted Assets*

On July 19, 2011, Ginny filed an OSC seeking to divide omitted assets. Of the 12 categories of assets she contended were omitted, only three are at issue here: (1) equity from a residence, (2) the value of firearms, and (3) "[a]ll of Michael's shares of [Ginny's family-owned business] Ecobaby in exchange for all of [Ginny's] share of [MJC]."

Michael and Ginny purchased a residence in August 2002 for approximately $530,000. They borrowed a down payment of approximately $109,000 from Michael's parents, subject to certain conditions. Title was held jointly by Ginny, Michael, and Michael's parents. When Ginny and Michael separated permanently in May 2003, they had not yet repaid Michael's parents or satisfied certain of the other conditions of that loan. Consequently, in June 2003, Michael and Ginny transferred their interest in the residence to Michael's parents by quitclaim deed.

Ginny argued that the value of the residence had increased $100,000 between August 2002 and June 2003 and that the resulting equity was an omitted asset. Michael argued that the residence was not an omitted asset because he and Ginny had disposed of

6

all their interest in it in June 2003—five months before the MSA and resulting nunc pro tunc judgment.

Ginny also identified as omitted assets "[n]umerous rifles of unknown value" and a handgun, the value of which she "ha[d] no idea." Ginny estimated the value of the rifles to be $9,000. Michael responded that there were about 10 50-year-old rifles worth about $100 each, but added that he had given them away when "Ginny made an issue of the rifles during the custody proceedings."

Ginny and Michael agreed that MJC was an omitted asset, but disagreed on its value.[5] Ginny argued the company was profitable, while Michael argued it operated at a loss.

Michael filed a companion motion to adjudicate omitted debts. He requested that the court order Ginny to reimburse him for half of the approximately $92,000 in debts that were omitted from the 2003 MSA.

The court heard the parties' OSC's on September 1, 2011, and issued its findings and order after hearing on September 8. The court awarded MJC to Michael at zero value, but otherwise found that neither party had met its burden with regard to establishing omitted assets or debts.

Ginny filed a notice of appeal on November 4, 2011; Michael has not appealed the denial of his OSC.

---

[5] Ginny's request for an exchange of ownership interests in MJC and Ecobaby is not an issue on appeal. Therefore, we will only address the valuation of MJC.

DISCUSSION

## I. *CHILD SUPPORT*

Ginny contends the trial court erred by (1) making the child support award retroactive to December 2010 instead of January 2009; (2) imputing nontaxable income of $5,890 per month to her; (3) failing to find that Michael had additional income beyond his W-2 income from CSIdentity; and (4) denying her request for need-based attorney fees. We disagree.

### A. *Standard of Review*

We review a child support order for abuse of discretion and, in doing so, determine whether substantial evidence supports the factual findings made in connection with the order. (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730.) In applying the abuse of discretion standard, we do not substitute our judgment for that of the trial court; we consider only whether any judge reasonably could have made the order. (*Id.* at pp. 730-731.) The court must, however, follow established legal principles in exercising its discretion, and we apply the independent or de novo standard of review in determining whether it did so. (*Id.* at p. 731.)

Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the fact finder's factual determinations (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874), viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254-1255). The issue is not whether there is

8

evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429, fn. 5.) Credibility is an issue of fact for the trier of fact to resolve (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622), and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614).

    B. *Retroactivity of the Award*

Ginny contends the trial court erred when it did not make the child support award retroactive to January 2009 because that was when she initially filed her OSC to modify support.[6] Michael contends Ginny forfeited this issue by failing to raise it at the January 2012 hearing, as instructed by the trial court. We agree that Ginny has forfeited this issue.

The court's February 2011 order following the parties' mediation provided that a subsequent support award would be made retroactive to December 2010, but expressly preserved "[e]ach party's claim to request retroactivity to February, 2009. . . ." Similarly, at the August 22, 2011 ex parte hearing to continue the date of the OSC hearing, the court advised the parties that it would be making any award retroactive to December 2010, but that Ginny could argue for an earlier date: "You can argue that when we get to the hearing. You can argue why it should go back even more." The court reiterated in its

_____

[6]    Family Code section 3653, subdivision (a), provides that "[a]n order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date . . . ." All further section references are to the Family Code unless otherwise specified.

order following that hearing that the court "shall be making child support orders retroactive to December 20, 2010, the date of [Ginny's] motion to modify child support. *An earlier date for retroactivity may be argued for at the hearing on January 6, 2012*." (Italics added.) Thus, the court made clear the fact that it would only make the award retroactive to 2009 if Ginny requested that relief at the January 6, 2012 hearing.

Ginny testified and argued at the January 6, 2012 hearing, but never addressed retroactivity. Even after Michael's counsel asserted during her closing argument that the support award should be retroactive to December 2010, Ginny did not address retroactivity in her rebuttal argument. Because Ginny did not request retroactivity to January 2009 during the January 6, 2012 hearing, she has forfeited the issue on appeal. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1528 ["Preliminarily, we note that [appellant's] argument as to the Judicial Council form was not made below, and thus is waived or forfeited."]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 ["Contentions or theories raised for the first time on appeal are not entitled to consideration."]; *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 ["It must appear from the record that the issue argued on appeal was raised in the trial court. If not, the issue is waived."].)

Even if we were to find that Ginny did not forfeit her right to argue retroactivity to 2009, we would nonetheless find the deficiencies in the record—particularly the absence of Ginny's 2009 and 2010 OSC's and the two stipulations and orders modifying support in 2009—so substantial as to preclude our meaningful review of the trial court's exercise of its discretion. (E.g., *In re Marriage of Lusby* (1998) 64 Cal.App.4th 459, 470 ["[I]t is

10

the burden of the party challenging the order or judgment on appeal to provide an adequate record to assess error. [Citation.] Where parties fail to do so, their claims must be resolved against them."]; *Estrada v. Ramirez* (1999) 71 Cal.App.4th 618, 620, fn. 1 ["It is the burden of appellant to provide an accurate record on appeal to demonstrate error. Failure to do so precludes an adequate review and results in affirmance of the trial court's determination."]; *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 ["Failure to provide an adequate record on an issue requires that the issue be resolved against plaintiff.].)

On the record before us, we are unable to conclude that the trial court abused its discretion in declining to make the child support award retroactive to January 2009.

C. *Imputing Income to Ginny*

Ginny's attacks on the trial court's imputation to her of $5,890 per month in nontaxable income focus primarily on accountant Huntoon's analysis of Ecobaby's books and records. Michael, on the other hand, contends the imputation is supported by Huntoon's analysis and reasonable inferences drawn from Ecobaby's poor recordkeeping. The record supports Michael's contentions.

1. *General principles governing child support awards*

"California has a strong public policy in favor of adequate child support." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283.) "That policy is expressed in statutes embodying the statewide uniform child support guideline." (*Ibid*., citing §§ 4050-4076.) "The guideline seeks to place the interests of children as the state's top priority." (§ 4053, subd. (e).) "In setting guideline support, the courts are required to

11

adhere to certain principles, including these: 'A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life.' " (*Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 283, quoting § 4053, subd. (a).) "Each parent should pay for the support of the children according to his or her ability." (§ 4053, subd. (d).)

"Section 4058 sets forth the manner by which a trial court is to ascertain a parent's income for purposes of determining the guideline child support amount." (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 641.) This section provides as follows:

> "(a) The annual gross income of each parent means income from whatever source derived, except as specified in subdivision (c) and includes, but is not limited to, the following:
>
> "(1) Income such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish a child support order under this article.
>
> "(2) Income from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business.
>
> "(3) In the discretion of the court, employee benefits or self-employment benefits, taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts.
>
> "(b) The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children.

"(c) Annual gross income does not include any income derived from child support payments actually received, and income derived from any public assistance program, eligibility for which is based on a determination of need. Child support received by a party for children from another relationship shall not be included as part of that party's gross or net income." (§ 4058.)

"In determining a parent's income for purposes of calculating guideline child support, a trial court may choose to follow the guidance of subdivision (a) of section 4058, by utilizing the factors identified in subdivision (a)(1) through (3) to determine a parent's actual income, *or* the court may, in its discretion, impute to that parent an income different from his or her actual income—i.e., an income amount that corresponds with that parent's earning capacity." (*In re Marriage of Sorge*, *supra*, 202 Cal.App.4th at p. 642.) "Thus, a trial court may ultimately calculate the guideline child support amount by using, as the income factor in its support calculation, either (1) the parent's actual income, as calculated under section 4058, subdivision (a) *or* (2) the parent's imputed income, as authorized by section 4058, subdivision (b), if the court determines that imputing income to the parent would be more appropriate and would better serve the child's best interests." (*In re Marriage of Sorge,* at pp. 642-643.)

2. *Analysis*

Accountant Huntoon reviewed Ecobaby's books and records from 2006 to 2011. He testified that he "had substantial data for 2006, '07, '08 and most of that in 2009, but

13

2010 and '11 . . . was lacking." Based on his review of Ecobaby's and Ginny's records,[7] Huntoon prepared a report and "Summary of Report Results."[8]

Huntoon characterized Ecobaby's recordkeeping as "very sloppy accounting" that failed to comply with the "generally accepted [accounting] principles" that "the major accounting firms utilize in reporting." A "princip[al] problem" in Ecobaby's recordkeeping was what Huntoon characterized as "a large incestuous movement of cash." For example, Huntoon identified nearly $86,000 in ATM withdrawals between 2006 and 2010 and more than $312,000 in other withdrawals during those same years.

Huntoon testified that his review of Ecobaby's records reflected that the company made numerous payments of Ginny's personal expenses. For example, Ecobaby made more than $90,000 in rent payments and more than $23,000 in car payments on Ginny's behalf. Huntoon's review of Ginny's tax returns indicated that Ginny did not report those payments to the Internal Revenue Service. The company also paid Ginny's personal utility bills. Huntoon also reported that Ecobaby paid corporate credit card bills that reflected personal use by Ginny, including charges incurred at a casino, a drug store, and a grocery store.

Although Ginny admitted that Ecobaby made some rent, auto, and utility payments on her behalf, she nonetheless contends the court erred in imputing income to

[7] We note that the most recent income and expense declaration in support of Ginny's OSC to modify support did not attach the required documentation concerning Ginny's income. According to Michael, Ginny "rarely provided" the required backup.

[8] We grant Michael's request to augment the record to include Exhibits AA, BB, and CC to Huntoon's report, which were before the trial court at the January 6, 2012 hearing.

her *at all* or, in the alternative, in determining the amount to be imputed. We are unpersuaded.

Ginny's threshold challenge is that Huntoon's opinions do not support the trial court's imputation of income to her at all because Huntoon "wasn't told to find income," he "was told to find the cash flow." We find this distinction immaterial under the circumstances. Section 4058, subdivision (a)(3) expressly authorizes the trial court, in its discretion, to include as income "employee benefits . . . , taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts." (See also *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 107-108 [husband's company paid $13,000 per month of personal expenses, including home mortgage and car payments].) Moreover, despite the scope of his assignment, Huntoon testified that corporate reimbursement of personal expenses "would probably be considered salary." Thus, the trial court did not err in imputing income to Ginny based on Ecobaby's payment of her personal expenses.

Ginny argues next that the amount of income the court imputed to her is unsupported in several ways. First, Ginny argues the $5,890—which is an average based on years 2006 through 2009—is unsupported because Huntoon's own analysis showed that the amounts of her personal expenses paid by Ecobaby in 2010 and 2011 declined dramatically. This argument ignores the fact that Huntoon described Ecobaby's records for 2010 and 2011 as "lacking." The trial court could also have properly inferred that Ginny's income declined in 2010 and 2011 because she admittedly chose to spend less

15

time working so she could "spend[] 60 hours a week on this" litigation.[9] (§ 4058, subd. (b) ["[t]he court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income"]; *In re Marriage of Sorge*, *supra*, 202 Cal.App.4th at pp. 642-643.)

Next, Ginny argues the court should not have imputed certain specific business expenditures as income to her. For example, Ginny testified that ATM withdrawals should not have been attributed to her because her mother made all of them to recover on a loan she made to Ecobaby. The trial court was not required to accept Ginny's explanation, particularly because Huntoon's analysis showed that the amount of ATM withdrawals was twice the amount of the purported loan from Ginny's mother. Moreover, Huntoon testified that the "loan" from Ginny's mother to Ecobaby could also properly have been considered a capital contribution for which her mother did not expect to be reimbursed. We will not second guess the trial court's credibility determinations. (*Johnson v. Pratt & Whitney Canada, Inc.*, *supra*, 28 Cal.App.4th at p. 622.)

Ginny also quibbles over specific credit card charges she contends were for business use and should not have been attributed to her. But it is not clear from the record that the court imputed all credit card charges to Ginny. Rather, it is possible that the court attributed only some of those charges to Ginny, but also attributed to her a portion of the approximately $312,000 in "customer withdrawals in even amounts" from Ecobaby's bank accounts that Huntoon identified. Given Ginny's lack of cooperation with the court-appointed accountant, omission of financial backup from her income and

---

[9] The trial court subsequently declared Ginny a vexatious litigant in March 2013.

16

expense declarations, and Ecobaby's "very sloppy accounting," Ginny "is in no position to complain that the trial court drew adverse inferences in modifying child support." (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38 [basing income on statement in loan application that contradicted income tax return]; (*In re Marriage of Chakko*, *supra*, 115 Cal.App.4th 104 at p. 109 ["A spouse who is the owner of a successful business and who has control of his or her income can structure income and the payment of expenses to depress income. This is not fair if it inures to the detriment of children. Here, the trial court drew the inference that Father's structuring of income and expenses was an attempt to minimize child support obligations."].)

D. *Attributing Income to Michael*

Ginny contends "[t]here was sufficient evidence to support [her] claim that Michael had income above and beyond that which he was paid on a W2 by CSIdentity." This misstates our standard of review: "'So long as there is "substantial evidence," the appellate court *must affirm* . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result.'" (*Rupf v. Yan*, *supra*, 85 Cal.App.4th at p. 429, fn. 5.) Under this properly articulated standard, we conclude Ginny's attacks on the sufficiency of the evidence are without merit.

For example, Ginny's assertion that Michael's Judicial Council form income and expense declaration filed on December 23, 2011, did not disclose a 2 percent partnership interest in Internet Megameeting ignores the fact that Michael's contemporaneous narrative declaration *did* disclose it. Importantly, accountant Summers was aware of this

17

partnership interest because his report references it.[10] The narrative also explained that Michael "ha[s] never actually worked for Internet Megameeting" or "received standard income such as wages or bonuses or income for contract work." Michael further explained that although he may have received K-1 forms documenting checks written to cover his tax liabilities arising from his partnership interest in Internet Megameeting, he never actually received the funds listed on the K-1's.

We also reject Ginny's claim that "payments made by MJC Enterprises for Michael's personal benefit should have been imputed as income to him." Summers's report directly addressed those benefits and MJC's other operating expenses and concluded that Michael "should be attributed zero income from this business."

Ginny also takes issue with Summers's conclusion that Michael did not exercise any of the stock options he was granted in CSIdentity.[11] She argues Summers's conclusion is wrong because the underlying premise—Summers's belief (as paraphrased by Ginny) "that the stock options . . . had not yet vested"—is also

---

[10]    Although Summers's report references an interest in "Internet Mega Marketing, LLC," our review of the record suggests this was a typographical error and that Summers intended to refer to Internet Megameeting.

[11]    Ginny cites no evidence in the record to establish that Michael actually exercised any options; she only challenges Summers's conclusion to the contrary.

wrong.[12]  But the record does not support this argument.  Summers did not state that Michael's options "had not yet vested," he stated that they "were not *fully* vested."  (Italics added.)  We are unable to determine from the record whether this is a material distinction and, therefore, resolve the issue in favor of the court's order.  (*Hernandez v. California Hospital Medical Center*, *supra*, 78 Cal.App.4th at p. 502 ["Failure to provide an adequate record on an issue requires that the issue be resolved against plaintiff."].)[13]

E.  *Attorney Fees*

Ginny contends the court's errors in determining the parties' income mandate reversal of its decision denying Ginny's request for need-based attorney fees.  Because we have concluded the court did not err in determining the parties' income, we likewise conclude the court did not err in denying Ginny's request for attorney fees.

## II.  *OMITTED ASSETS*

Ginny contends the trial court abused its discretion by (1) failing to find the equity from the residence was an omitted asset, (2) failing to find the value of the rifles was an omitted asset, and (3) awarding MJC to Michael at zero value.  None of these claims has merit.

---

12    Ginny argues Summers was wrong because she claims 12,500 options vested in January 2011.  We are unable to evaluate that claim, however, because it is based on an exhibit purportedly lodged with the trial court but which is not in the appellate record.

13    Ginny's additional challenges to the court's determination are similarly unsupported by the record and we reject them on that basis.

A.      *Summary of Applicable Legal Principles*

Section 2556, which governs the disposition of omitted marital assets, provides:

> "In a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties, the court has continuing jurisdiction to award community estate assets or community estate liabilities to the parties that have not been previously adjudicated by a judgment in the proceeding.  A party may file a postjudgment motion or order to show cause in the proceeding in order to obtain adjudication of any community estate asset or liability omitted or not adjudicated by the judgment.  In these cases, the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability."

"[T]he family court's power under section 2556 is limited to assets which have not been previously adjudicated.  The family court's power is also limited to community property and community liabilities; the statute gives the court no power to make an award with respect to a party's separate property or separate liabilities."  (*In re Marriage of Hixson* (2003) 111 Cal.App.4th 1116, 1123.)

"On appeal we review a ruling dividing property under the abuse of discretion standard."  (*In re Marriage of Quay* (1993) 18 Cal.App.4th 961, 966.)  "Factual findings are upheld if supported by substantial evidence."  (*Ibid.*)

B.  *The Residence and Rifles*

Ginny contends the equity from the residence and the value of rifles were omitted assets because the "judgment in this case was based upon [the November 2003 MSA]," which "did not address the Residence or the antique rifles."  Michael contends neither

were omitted assets because they were disposed of prior to the MSA and judgment. We conclude the trial court did not err in finding that Ginny had not met her burden.

It is undisputed that Ginny and Michael transferred their interest in the residence to Michael's parents by quitclaim deed in June 2003—five months before the effective date of the MSA and resulting judgment. "It is well recognized that a quitclaim deed is a distinct form of conveyance and operates like any other deed inasmuch as it passes whatever title or interest the grantor has in the property." (*In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 496; see also *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 239 [" 'A quitclaim deed transfers whatever present right or interest the grantor has in the property.' "], quoting *Westlake v. Silva* (1942) 49 Cal.App.2d 476, 478.].) Thus, substantial, undisputed evidence established that the residence was no longer a marital asset at the time of the judgment.

Additionally, Michael stated in a declaration that "[w]hen Ginny made an issue of the rifles during the custody proceedings, [he] gave the rifles away." Custody was at issue as early as May 2000, when Michael sought primary custody. There is no other evidence in the record regarding when the rifles were acquired or disposed of, and the parties did not discuss the rifles during the hearing on Ginny's OSC. Thus, the trial court could reasonably have inferred that Michael disposed of the rifles as early as 2000 such that they were no longer marital assets at the time of the 2003 judgment.

C. *Valuation of MJC Enterprises*

Ginny contends that although the trial court properly found MJC to be an omitted asset, the court erred in awarding it to Michael at zero value. We are not persuaded.

21

To begin with, Ginny admits that "on paper the business was showing a loss" for 2003 and further concedes she offered no evidence of valuation to the trial court.[14]

By contrast, Michael submitted a declaration explaining the profitability and value of MJC as follows:

> "[MJC] is my internet provider business. I am the only employee. At the time Ginny and I signed the MSA, the business was operating at a loss. . . . [¶] . . . The revenue for MJC dropped when I stopped consulting and began working for CSIdentity. [¶] . . . [¶] . . . I am requesting that MJC Enterprises be awarded to me at zero value."

Additionally, in 2011, accountant Summers observed that MJC "reported significant tax losses in each of the latest three calendar years" and has "required operating expenses in excess of its revenues and does not make a profit." Although we examine valuation of an omitted asset at the time of judgment, Summers's conclusions in 2011 are at least consistent with the court's determination of MJC's value in 2003.

On this record, we cannot say that the trial court abused its discretion in concluding that Ginny failed to meet her burden regarding the valuation of MJC.

---

14     Perhaps Ginny presented no evidence of MJC's valuation because the remedy she sought from the trial court was "for Michael to retain ownership of MJC Enterprises and [Ginny] to retain ownership of Ecobaby." Ginny claimed Ecobaby "overall has not made a profit." If Ginny was proposing an even exchange of interests, the court could reasonably have inferred that MJC also "has not made a profit."

## DISPOSITION

The orders are affirmed.  Appellant to pay costs on appeal.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.