Filed 5/16/25  Marriage of Bianchi CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of MARC and NINA BIANCHI. | |
| MARC PAUL BIANCHI,<br><br>        Respondent,<br><br>v.<br><br>NINA BIANCHI,<br><br>        Appellant. | A170032<br><br>(San Mateo County Super. Ct. No. 19FAM00332A) |

**BY THE COURT:**[*]

This is the second appeal to come before us in this highly acrimonious divorce proceeding.  In our prior appeal, *Bianchi v. Bianchi* (Sept. 9, 2024, A168349 [nonpub. opn.]) (*Bianchi*),[1] we affirmed the trial court's rulings on cross-petitions for domestic violence restraining orders (DVRO) that denied appellant Nina Bianchi's petition and granted that of respondent Marc Bianchi.[2]  In the instant appeal, Nina challenges subsequent orders the court

---

[*] Before Humes, P.J., Banke, J., and Smiley, J.

[1] On our own motion, we take judicial notice of our prior opinion. (Evid. Code, §§ 452, subd. (d), 459.)

[2] For simplicity's sake we refer to the parties by their first names.

issued on March 7, 2024, and filed the following day, on attorney fees, child custody evaluation costs, supervised visitation costs, and child support.[3]  We affirm.

## BACKGROUND[4]

"In 2014, Nina and Marc married in Texas.  Their daughter (hereinafter Daughter) was born the same year.  They soon went into debt, sold the house Marc owned in Texas, and went to live with Marc's mother in San Mateo.

"The couple divorced in 2019.  The stipulated judgment of dissolution awarded sole legal and primary physical custody of Daughter to Marc, with reasonable visitation by Nina.  Nina subsequently moved to Southern California to live with a new romantic partner, D.A.  She returned to San Mateo several times to visit Daughter, staying at the San Mateo house with Marc and his mother.

"Later in 2019, Nina and D.A. went their separate ways.  Nina demanded to move back in with Marc and threatened to ' "turn [him] in for abuse" ' if he refused.  Marc and his mother agreed to let Nina stay for a few days—but she stayed for months.  During that time, she made complaints about D.A. to the police and told Marc she was going to start fabricating and expanding on her story.  Marc warned her he was ' "not going to perjure [him]self if there's any kind of lawsuit,' " to which Nina replied, ' "Don't worry.  I'm going to kill you and take the $2 million [life insurance payment] before you'll need to . . . perjure yourself." '

---

[3]  Nina is appearing in propria persona.  Marc has not appeared.  The only brief filed is Nina's appellant's opening brief.

[4]  We include here the "Background" set forth in our prior opinion.

2

"Nina spent most of her time working on a lawsuit against D.A. She told Marc she would 'torture' D.A. and his friends and family through lawsuits and online harassment. She also threatened Marc, ' "Don't you think everything I'm doing to [D.A.] I could do to you?" '

"In May 2020, Nina was still living with Marc and his mother. One morning, she woke Marc and started harassing and insulting him, demanding that he withdraw money from an ATM. She had mentioned going to Texas with Daughter, and Marc had told her she could not take Daughter.

"Marc's mother and Daughter woke up during the fight and came out of their bedrooms. Nina told Marc and his mother they were ' "fools for sleeping with one eye open" ' because she ' "could have come in the middle of [the] night and . . . ended it all." ' She made a throat-cutting gesture as she said this.

"Marc told his mother they needed to call 911, but Nina called first. The police and other responders arrived and placed Nina on a psychiatric hold. She was hospitalized for about a week.

"Marc filed a request for a DVRO, and the trial court issued a temporary restraining order and a move-out order against Nina. The court also granted Marc's request for an order restricting Nina to supervised visitation with Daughter.

"After Nina was discharged from the hospital, she went to stay with her mother in Texas. Nina then filed her own request for a DVRO, claiming Marc was 'violent toward[s] [her] for years, including sexual assault' and rape. She attached photographs she took of bruises Marc purportedly caused in 2016 and 2019 and detailed several alleged instances of abuse. Nina also sought legal and physical custody of Daughter and twice weekly supervised visitation in the meantime. The court granted a temporary restraining order

3

against Marc and ordered that Nina 'shall have supervised and virtual visits with [Daughter] up to 2 times a week.' The court subsequently issued an amended visitation order stating, 'the visits shall not be more than 2 time[s] per week and in accordance with the availability of the supervisor.'

"Nina remained in Texas and visited with Daughter virtually with a supervisor. She also altered Marc's professional Web site to display an accusation that Marc had assaulted and kidnapped her. And she contacted the police in both Texas and San Mateo, accusing Marc of raping her and committing other crimes.

"In late 2021, Daughter made comments about self-harm during a virtual visit with Nina. Nina and the supervisor reported these comments to a child protective agency. Marc did not make Daughter available for several scheduled visits after this, and he requested an order appointing a new supervisor. Nina claimed the missed visits violated the amended visitation order and were acts of domestic violence, and she requested additional visits to make up the lost time. The court issued another visitation order, directing visits to resume with the original supervisor and providing for make-up visits. Nina then moved for an order to show cause for contempt regarding the missed visits and Marc's alleged removal of Nina as a beneficiary of his life insurance policies.

"The parties stipulated to an evidentiary hearing on their respective DVRO requests and to the admission of a focused assessment by a medical expert, who recommended a child custody and parenting plan. The evidentiary hearing was held over six days in early 2023. At its conclusion, the trial court announced its decision, granting Marc's request for a DVRO and denying Nina's. The court awarded sole legal and physical custody of Daughter to Marc.

"The trial court explained that 'ultimately what [its ruling] came down to was credibility.' Nina had exhibited 'problematic behaviors' in the courtroom, such as rolling her eyes, and video evidence showed her 'as a dramatic person and at times a manipulative person.' The court found her allegations that Marc had bruised her through physical abuse 'hard . . . to . . . credi[t],' considering evidence of the context surrounding the photographs. The court 'just didn't buy' Nina's testimony that many of her communications with Marc were 'canary trap[s],' or that documents were altered to 'identify [a] person who invaded [her] privacy or who leaked [a] document'— particularly because Nina had previously explained inconsistencies in her communications as artistic expressions. In contrast, the court found Marc credible and his fears of 'what [Nina is] capable of' to be reasonable given her actions with respect to D.A. and her threats against Marc.

"With regard to custody, the trial court found the presumption established by Family Code section 3044 applied and had not been rebutted '[a]t this time.' The court adopted several components of the expert-recommended custody plan and deferred ruling on others until a subsequent hearing. The court stated it would consider whether Nina's visits with Daughter should continue to be supervised at the next hearing.

"Nina's counsel stated on the record that Nina did not request a statement of decision. Then, after the deadline (Cal. Rules of Court, rule 3.1590(d)), counsel filed a request for one on her behalf. The trial court did not issue a statement of decision." (*Bianchi, supra,* No. A168349, fns. omitted.)

Following the multi-day hearing on the DVRO applications, the parties litigated attorney fees, cost allocation, and child support issues. After

considering the parties' briefs, supporting documentation, and argument, the trial court made the orders Nina challenges in the instant appeal.

## DISCUSSION

### *Attorney Fees*

The trial court addressed two attorney fee issues: (1) fees sought by Marc pursuant to Family Code section 6344[5] as the prevailing party on both DVRO petitions, and (2) fees sought by Nina under section 2030.

The court denied Marc's fee request, stating the "Court does not find that Ms. Bianchi has nor is it reasonably likely that she will have the ability to pay the requested $100,000 plus in attorneys' fees and costs incurred by Mr. Bianchi." As the court observed, while section 6344 states fees "shall issue" to the party seeking a DVRO if he/she prevails, there is a statutory caveat—before fees can be awarded, "the court shall first determine pursuant to Section 270 that the party ordered to pay has, or is reasonably likely to have, the ability to pay." (§ 6344, subds. (a) & (c).)

The trial court also denied Nina's fee request, providing several reasons for doing so. It took "into consideration" that section "6344 prevailing party fees . . . could potentially offset" an award of section 2030 fees. It also "did not find" that Marc "is able to pay for" both his own and Nina's fees. Although Marc had already "paid for a sizeable amount of attorney's fees and costs, the evidence provided reveals that he has borrowed this from his

---

[5] All further statutory references are to the Family Code unless otherwise indicated.

mother[6]—just as Ms. Bianchi has purportedly borrowed money to pay her attorney's fees from her family."[7]

On appeal, Nina focuses solely on the trial court's comments that the section 6344 fees Marc sought "could potentially offset" section 2030 fees, which she sought. Not only has she taken the court's statements out of context but, more importantly, she disregards the court's additional reasoning that at this point in the litigation Marc, himself, has very limited resources, and like Nina, Marc has been borrowing from his family to cover his fees and costs. Having failed to address these additional grounds, Nina cannot succeed on her challenge to the trial court's denial of fees under section 2030. (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 [appellant's failure to address all grounds for trial court's ruling forfeits appellate review].)

While the foregoing, alone, is dispositive of her challenge to the court's denial of her section 2030 fee request, we briefly discuss her claim that the trial court's denial of fees to Marc under section 6344 is an "express contradiction[]" (capitalization omitted) with its denial of fees to her under section 2030, and specifically contradicts the court's statement that it "does not find that Ms. Bianchi has nor is it reasonably likely that she will have the

---

[6] Declarations by Marc and his mother stated Marc had borrowed over $297,000 to pay litigation expenses, of which he had repaid only $5,720. His mother had also loaned funds to Marc and Nina to enable them to move from Texas to California and to pay off massive credit card debt (some of which Marc was able to negotiate). She had also loaned money to Nina to assist her in relocating from Marc's mother's residence to Los Angeles.

[7] The trial court did not identify the evidence it relied on to support its finding as to Nina. But the record includes evidence Nina had been residing with her mother and stepfather, both of whom were employed and highly educated, and she had received loans during the litigation from her mother.

7

ability to pay the requested $100,000 plus attorneys' fees and costs incurred by Mr. Bianchi."

As the trial court recognized, while both sections 6344 and 2030 concern attorney fees, they serve different purposes and have somewhat different requirements. Section 2030 provides in pertinent part: "When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward." (§ 2030, subd. (a)(2).)

Thus, section 2030 instructs the court to consider multiple factors—whether an award of fees and costs is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for the attorneys of both parties. "Given this statutory framework, a trial court has wide discretion in fashioning an award of attorney fees in marital proceedings." (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662.) "Further, in determining whether to award attorney fees to one party, the family court may consider the other party's trial tactics." (*Ibid.*)

The trial court here duly considered all pertinent factors in light of the entirety of this case. It found that while there is a disparity of income between the parties, it is not, at this point in the litigation, appropriate to

8

grant Nina further fees. Specifically, it found both parties have some access to funds (borrowed from their families), and Marc, himself, no longer has the ability to pay for both his own and Nina's legal representation.[8] The record also reflects the trial court has considerable concern about the extent of Nina's litigiousness. It made a point of stating that its refusal to award fees was not to be construed as "an invitation on anybody's part to continue with additional litigation, to file unfounded or unsupported additional DVROs or any other litigation that's not justified." It further commented as to the petitions on which it had just ruled (granting Marc's and denying Nina's) "there was a lot of alarming actions that were done and a large part of the litigation was due to mom's part in all of this."

Thus, even had Nina not forfeited her challenge to the denial of section 2030 fees, the record amply supports the trial court's exercise of its discretion in denying her request for further attorney fees.

### Cost of Custody Evaluation

Following the trial court's grant of Marc's request for a temporary DVRO, the court ordered a child custody evaluation under section 3111 and Evidence Code section 730 to provide recommendations on the scope and conditions on visitation. The order specified that Marc agreed to advance the costs "subject to reallocation at hearing or trial." Accordingly, following the trial court's grant of Marc's application for issuance of a full DVRO, Marc requested that the court reallocate the cost of the custody evaluation. After further briefing and hearing, the court allocated 75 percent of the cost to

---

[8] There is also evidence Marc has shouldered *very* significant expenses that Nina either badgered Marc to incur or incurred herself, and that at this point, between paying those expenses, paying all of their daughter's expenses, and paying litigation costs, he has next to no assets.

9

Marc and 25 percent to Nina and required Nina to reimburse Marc $13,341.24.

Citing to *A.P. v. K.T.* (2023) 89 Cal.App.5th 988 (*A.P.*), Nina maintains the trial court's reimbursement order is, again, at odds with the court's statement that it "does not find that Ms. Bianchi has nor is it reasonably likely that she will have the ability to pay . . . attorneys' fees and costs incurred by Mr. Bianchi."

In *A.P.*, the mother claimed that given her financial condition, the trial court had erred in ordering her to share in the expense of a custody evaluation. The legal question before the Court of Appeal was the proper analytical framework for allocating expenses incurred by an evaluator appointed under Evidence Code section 730, which generally authorizes court-appointed experts.[9] The appellate court ruled that "in allocating the costs of a court-appointed child custody evaluator, the court must consider the parties' ability to pay, whether the child custody evaluator is appointed by the court under Evidence Code section 730 or under the more specific provisions of the Family Code (Fam. Code, §§ 3111–3112)." (*A.P., supra,* 89 Cal.App.5th at p. 990.)

In the case at hand, the child custody evaluator was appointed pursuant to both Evidence Code section 730 and Family Code section 3111.

_____

[9] Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court."

10

As the *A.P.* court observed, while both code provisions pertain to court appointed experts, the Family Code provisions pertaining to child custody experts are the more specific. We therefore focus on those provisions.

Section 3112 provides in pertinent part: "Where a court-appointed investigator is directed by the court to conduct a custody investigation or evaluation pursuant to this chapter or to undertake visitation work, including necessary evaluation, supervision, and reporting, the court shall inquire into the financial condition of the parent, guardian, or other person charged with the support of the minor. If the court finds the parent, guardian, or other person able to pay all or part of the expense of the investigation, report, and recommendation, the court may make an order requiring the parent, guardian, or other person to repay the court the amount the court determines proper." (§ 3112, subd. (a).) Thus, as *A.P.* summarized, section 3112: "(1) imposes an affirmative duty on courts to assess a party's ability to pay the expenses associated with a child custody investigation or evaluation; (2) makes a party's contribution towards those expenses discretionary, not mandatory, even if the party has the ability to pay; and (3) presumes the court may initially bear the costs of an evaluation and so specifies that repayment is to the court, not a private party, thus placing the initial obligation to determine the amount of compensation and to compensate such evaluators with the court itself, not the parties." (*A.P., supra,* 89 Cal.App.5th at p. 1000.)

The *A.P.* court then turned to the record before it, which was "not entirely clear"—but clear enough to conclude the trial court had "failed to consider all the factors relevant" to assessing the "mother's ability to reimburse [the] father." (*A.P., supra,* 89 Cal.App.5th at p. 1002.) The trial court stated on the record only that it had reallocated 25 percent of the cost of

11

the evaluation to the mother "based on the ratio of her net spendable income to father's, subtracting only her child support payments to father. In other words, it attempted to allocate the cost according to the parties' relative posttax income." (*Id.* at p. 1003.)

However, the record indicated there were additional costs the trial court should have taken into account, including the "mother's $995 per month in rent, her payments for food and utilities and other basic living expenses," financial "obligations imposed on her by the family court, including mother's share of the monthly costs of supervised visitation with the minor, and her share of [the] original child custody evaluation and child support arrears," and "other debts subject to" the mother's bankruptcy proceeding that was under way at the time. (*A.P., supra,* 89 Cal.App.5th at p. 1003.) The court's failure to consider these expenses and debts was of even greater consequence because the father's "resources were vastly superior to" the mothers. (*Id.* at pp. 1003–1004.) "Where one party's income is very limited, the bite that expenses may take out of her income may reduce, or even eliminate, her ability to pay court-imposed costs." (*Id.* at p. 1003.) "[O]nce necessary expenses are subtracted from each parties' income, the lower earning party might have nothing left, whereas the same might not be true for the higher earning party, who might have plenty of leftover discretionary income." (*Id.* at p. 1004.) The court reversed and remanded for the trial court "to engage in a proper ability-to-pay inquiry." (*Ibid.*)

The Court of Appeal closed with the following comments about child custody evaluations: "Like some other tools that are available in family court proceedings, child custody evaluations can be expensive. Yet many of the litigants who appear in family law courtrooms are individuals of modest means and allocating the costs of these and other expensive tools, even in

part, to those who cannot afford to pay for them threatens their ability to provide for their own and their children's most fundamental needs. . . . [¶] We recognize that private child custody evaluators can perform an important function in family law cases, and a family court may use them where one or both parties can afford to pay their fees. What it may not do, however, is use that expensive tool and then allocate the costs, even in part, to a litigant who cannot afford them. Before allocating any portion of a custody evaluator's fees to a litigant who objects that he or she cannot afford to pay them, the court must thoroughly assess that litigant's ability to pay, taking into account not only income and assets but also indebtedness, ongoing basic expenses and other obligations, including those previously imposed by the court itself earlier in the litigation." (*A.P., supra,* 89 Cal.App.5th at p. 1005.)

Here, the trial court took a somewhat holistic approach to allocating the cost of the child custody evaluation—stating at the hearing, "I'm looking at the context of all this litigation, where we are today, why the fees were incurred and the ultimate requirement and obligation that includes child support and having a child together is that both parties are responsible and obligated to support the child." It pointed out, for example, that "supervised visitation [was] directly a consequence and result of the domestic violence restraining order that is in place" against Nina and the custody evaluation was undertaken "in large part . . . because of the court trying to understand mom, her actions, and her request to move away." Nina should, said the court, "pay her fair share" of the custody evaluation.

We appreciate the trial court's view that Nina should take responsibility for the court having appointed an expert to conduct a child custody evaluation and make recommendations as to the scope and

13

conditions of visitation. However, the plain language of section 3112, subdivision (a) is singularly focused, as a threshold matter, on financial capability—i.e., "the court shall inquire into the financial condition of the parent . . . [and] "[i]f the court finds the parent . . . able to pay all or part of the expense of the investigation, report, and recommendation, the court may make an order requiring the parent . . . to repay the court [or, in this case, the other parent] the amount the court determines proper."

The trial court did not, however, shirk its responsibility to make a finding as to whether Nina has some ability to contribute to the cost of the custody evaluation. It expressly found Nina "has the ability to" contribute to the cost of the child custody evaluation, stating that that while she has "an 11th grade education," she "is capable of earning" and "does work." And as we have observed, the court also found Nina has access to some financial resources provided by her mother.

In her appellate brief, Nina does not acknowledge these additional findings by the trial court or any of the evidence in the record that supports them. This is fatal to her challenge to the court's ruling reallocating to her part of the cost of the child custody evaluation. An appellant must " ' "fairly summarize all of the facts in the light most favorable to the judgment" ' "— not summarize just their own evidence—or a claim that the evidence does not support the trial court's findings is waived. (*Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914, 934–935 (*Contra Costa County*); *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 ["An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the

14

judgment. An appellant . . . who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment."].)

Instead, Nina argues only that the trial court did not engage in a sufficiently thorough analysis of her ability to pay, citing again to *A.P.* But the record in *A.P.* was vastly different than that here. In that case, the sole comment the trial court made on the record was that 25 percent of the cost of the child custody evaluation would be reallocated to the mother "based on the ratio of her net spendable income to father's, subtracting only her child support payments to father." (*A.P., supra,* 89 Cal.App.5th at p. 1003.) Moreover, the briefing in that case was apparently sufficient to guide the appellate court to copious evidence of the mother's expenses, including bankruptcy debts, the court should have taken into account. (*Ibid.*)

The trial court here, in contrast, did not fixate on the parties' relative post-tax income. To the contrary, it had before it not only multiple days of testimony and evidence presented by the parties, but also the briefing and declarations filed prior to that hearing, as well as the briefing and declarations submitted after that hearing. Suffice it to say the evidence was in sharp conflict and there is ample evidence that Nina is not wholly impecunious and, more importantly, has the ability to help contribute to the cost of the custody evaluation.[10] For example, Nina, herself, stated in one of

_____

[10] As an appellate court, we must view the evidence "in the light most favorable to the prevailing party, drawing all reasonable inferences in support of" the trial court's findings. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) We do not reweigh the evidence, resolve evidentiary conflicts, or make our own inferences or deductions from the evidence. (*Newman v. Casey* (2024) 99 Cal.App.5th 359, 378.) "[T]he testimony of even one witness may support a finding" (*id.* at p. 375), and in a bench trial, " 'the trial court is the "sole judge" of witness credibility' " (*Jennifer K. v. Shane K.*

her declarations that she is "[p]resently" residing in Texas, "has a job, health insurance, and housing in a great school district" and "can provide and care for the minor child's needs." She testified at her deposition that she had earned $63,000 from photoshoots she had done for a company. She also testified to her experience in web design. Marc additionally presented evidence of Nina's work experience with the company at which her mother and stepfather are employed, that during visitation Nina showed their daughter a spacious " 'new apartment' " with an abundance of toys, a new computer and a scooter, and during several in-person visitations, Nina paid for private horse riding lessons for their daughter. Marc also presented evidence of job openings in the Houston area (where Nina lived at the time) for her skill set and educational level. Nina makes no mention of any of this evidence in her appellant's opening brief and therefore has waived her challenge to the trial court's reallocation ruling. (See *Contra Costa County, supra,* 235 Cal.App.4th at pp. 934–935 [an appellant must " ' "fairly summarize all of the facts in the light most favorable to the judgment" ' "— not summarize just their own evidence—or a claim that the evidence does not support the trial court's findings is waived]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["appellants who challenge the decision of the trial court based upon the absence of substantial evidence to support it ' "are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed waived." ' " Quoting *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.].)

---

(2020) 47 Cal.App.5th 558, 579). The judge may believe or disbelieve witnesses if there is any rational ground to do so, and these credibility determinations " 'are subject to extremely deferential review.' " (*Ibid.*)

16

In sum, not only has Nina waived her challenge to the trial court's reallocation ruling by failing to acknowledge and discuss the evidence that supports the court's threshold ability-to-pay determination, that evidence, which we must credit, amply supports the court's exercise of its discretion in allocating 25 percent of the cost to her.

### Cost of Supervised Visitation

After issuing a temporary DVRO against Nina, the trial court ordered that her visitation with the couple's minor daughter, whether in person or virtual, be supervised. (*Bianchi, supra,* No. A168349.) At that time, Marc assumed the costs of supervised visitation. After the six-day hearing and issuing a full DVRO against Nina, the court ordered her, commencing June 1, 2023, to pay the costs of in-person supervised visitation. The court further ordered, commencing in August 2023, that virtual visits could take place without supervision. Marc then sought reallocation of the supervised visitation costs he had paid. The court granted his request, ordered reallocation of costs incurred between June 7, 2022, and May 31, 2023, and required Nina to reimburse Marc $15,440.

Nina makes the identical challenge to the trial court's reallocation of the costs of supervised visitation as she makes to the court's reallocation of part of the costs of the child custody evaluation. We therefore need not, and do not, discuss her challenge again here. In short, we reject her challenge to the reallocation of supervised visitation costs for all the same reasons we reject her challenge to the apportionment of the cost of the child custody evaluation.[11]

---

[11] We note that when it comes to the cost of supervised visitation, there is no statutory directive pertaining specifically to the allocation of such costs, as there is with respect to the cost of child custody evaluations. Rather, section 270 broadly states: "If a court orders a party to pay attorney's fees or

17

*Child Support*

By stipulation early in the litigation, Marc received sole legal custody and primary physical custody of the parties' daughter, and child support by Nina was set at zero. Marc subsequently sought a modification requiring Nina to contribute to child support. After the hearing on the DVRO cross-petitions, the court addressed the issue after further briefing and hearing.

The court set child support at "$0 per month from July 1, 2022, through January 31, 2024," which took "into consideration" the court's ruling on reallocation of the cost of the child custody evaluation and costs of supervised visitation. Commencing February 1, 2024, Nina was required to pay child support of $543 in "guideline child support," which would be offset in any given month by any supervised visitation costs she incurred up to $543. The court further ordered the parties to meet and confer regarding a payment schedule for the reimbursement amounts Nina owed for the cost of the child custody evaluation and supervised visitation, and, if they could not agree, fixed a repayment schedule that added specified amounts to the $543 monthly child support she owed.

Nina's challenge to the trial court's child support ruling boils down to a complaint that the court improperly "imputed" income to her. She insists her burden of "debt-financed" expenses and lack of full time employment excuse her from being obligated to share in child support.

---

costs under this code, the court shall first determine that the party has or is reasonably likely to have the ability to pay." Case law, in turn, establishes that a "trial court has broad discretion to fashion appropriate custody and visitation orders," including allocating visitation costs. (See generally, e.g., Cal. Family Law Report (Sept. 2024), ch. G, Custody, XIV. Visitation § G.142.0.2.2.)

18

"California has adopted a 'statewide uniform guideline' for determining child support according to a complex formula based on each parent's income and custodial time with the child. (§§ 4050, 4055. . . .) The child support amount the formula establishes is rebuttably presumed to be the correct amount, and the court may order a different amount only in limited circumstances and only after making certain findings. (§ 4057. . . .) Determining the amount of child support therefore is a highly regulated area of the law, and the only discretion the trial court has is the discretion conferred by statute or rule. [Citation.] [¶] The Family Code grants the trial court discretion to impute income to a parent based on his or her 'earning capacity.' (§ 4058, subd. (b).) Specifically, section 4058, subdivision (b) states, 'The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children.' " (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1245, fn. omitted (*McHugh*).)

"If a parent is unwilling to work despite the ability and the opportunity, earning capacity may be imputed." (*In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1338, citing *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1217.) "A parent does not ' " 'have the right to divest himself [or herself] of his [or her] earning ability at the expense of . . . minor children.' " ' [Citation.] When a parent decides not to seek employment to the best of his or her ability, the court must retain discretion to impute income—otherwise 'one parent by a unilateral decision could eliminate his or her own responsibility to contribute to the support of the child, causing the entire burden of supporting the child to fall upon the [fully] employed parent.' " (*LaBass,* at p. 1339, quoting *In re Marriage of Paulin* (1996) 46 Cal.App.4th 1378, 1384, fn. 5.)

"The Family Code does not define earning capacity, but its meaning has been established through case law. [Citation.] ' "Earning capacity is composed of . . . the ability to work, including such factors as age, occupation, skills, education, health, background, work experience and qualifications . . . and . . . an opportunity to work. . . ." [Citation.]' (*Mendoza v. Ramos* (2010) 182 Cal.App.4th 680, 685. . . .) 'The "opportunity to work" exists when there is substantial evidence of a reasonable "likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income.' " (*McHugh, supra*, 231 Cal.App.4th at p. 1246, italics omitted.) "The parent seeking to impute income must show that the other parent has the ability or qualifications to perform a job paying the income to be imputed and the opportunity to obtain that job, i.e., there is an available position. The parent seeking to impute income, however, does not bear the burden to show the other parent would have obtained employment if it had been sought." (*Id.* at p. 1247.)

We review a trial court's imputation of income for abuse of discretion. (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1079 (*Berger*).) Under this standard, an " 'appellate court should not substitute its own judgment for that of the trial court; it should determine only if any judge reasonably could have made such an order.' " (*In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 994.) "[W]e consider only 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' " (*Berger*, at p. 1079.)

Nina reargues the claims she made in the trial court—e.g., that she has no resources to assist with support, she has significant debt, and she has an

"autism diagnosis."[12]  She continues to disregard the evidence we have already discussed that support findings that she *does* have marketable skills and she *has* earned income in the past with these skills.  In short, there is evidence in the record that she has the "ability to work" given her age, skill set, health, background, and work experience, and there is evidence in the record of the "opportunity to obtain" employment.

Nina also claims the trial court should have made a low-income adjustment pursuant to section 4055, subdivision (b)(7).  Nina has not identified where in the record she raised this issue in the trial court.  Nor have we discerned any reference to it in reviewing the reporter's transcript of the January 24, 2024, hearing that specifically addressed the issues pertinent to the instant appeal.  The issue has therefore been forfeited on appeal.  (*In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 144 ["For better or worse, California child support law now resembles determinate sentencing in the criminal law:  The actual calculation required of the trial judge has been made been so complicated (see generally Fam. Code, § 4055) that, to conserve judicial resources, any errors must be brought to the trial court's attention at the trial level while the error can still be expeditiously corrected."].)

Nina lastly claims the trial court, in departing from guideline support, failed to make "findings" doing so was in the child's "best interests."  To begin with, the departures Nina complains about—setting at $0 for 2023 back child support and allowing her 2024 child support obligation to be "offset" by the

---

[12]  Nina submitted no medical evidence supporting such diagnosis, and it came up when her attorney tried to explain-away what the trial court called "very problematic behaviors" in the courtroom during the multi-day hearing on the DVRO petitions, the court observing "your attorney . . . tried to explain this with your apparent recent diagnosis of Asperger's or high functioning autism" for which the court had seen "no medical support."

21

amount, if any, she pays for in person supervised visitation—are for *her* benefit. She therefore is not aggrieved and has no basis to challenge these aspects of the court's support rulings. Furthermore, the court's three-page attachment to its order explaining its rulings provides an ample explanation as to why the court found these provisions favoring Nina are also in the child's best interest, namely they facilitate visitation with her mother.

In sum, the trial court did not abuse its discretion in imputing income of $2,900 a month to Nina and ordering her to pay $543 month in guideline support, with departures therefrom as permitted by the terms of the court's order.

## DISPOSITION

The court's orders dated March 3, 2024, and filed March 8, 2024, are AFFIRMED.